OPINION OF THE COURT
William D. Friedmann, J.
The legislative findings, declaration provisions and tests of the new “Incarcerated Parents Law” (L 1983, ch 911, eff Jan. 1, 1984), should be read into any change of name proceeding under article 6 of the Civil Rights Law affecting an incarcerated parent.
Petitioner mother, pursuant to article 6 of the Civil Rights Law, seeks to change her 10-year-old daughter’s last name, from the surname of her former husband and father of the infant, to her maiden name. The father, who was incarcerated in the State of Georgia prior to this proceeding and so remains, objects to such change.
THE ISSUES
Three issues relating to an incarcerated parent who has lost his civil rights, pursuant to section 79 of the Civil Rights Law, and who is affected by a change of name *666 application (Civil Rights Law, art 6), seem of great importance. (1) The right to notice, (2) the right of standing to challenge or withhold consent and (3) the balancing of interests between the desires of the incarcerated parent and the welfare of the infant (generally, see, Rights and Remedies of Parents Inter Se with respect to the Names of Their Children, Ann., 92 ALR3d 1091).
RELEVANT FACTS
This court’s investigation reveals the following to be uncontroverted: The infant was born on December 11, 1973. Her father left New York in December, 1974, and her parents were divorced on October 31, 1975. The father, in 1979, in the State of Florida, changed his name from Thomas James Petras to Thomas A. Ga Donna, for alleged business reasons. He was indicted (11 counts) in the State of Georgia, on October 30,1980 and charged with “Theft by Receiving Stolen Property — Felony.” On November 23, 1981, he was found guilty on all counts and started to serve his sentences on or about December 23, 1982 under the jurisdiction of the Georgia penal system. His tentative parole or release from incarceration is December 15, 1985. At the suggestion of this court, the father has changed his name back to Thomas James Petras. (Decree dated Jan. 31, 1984.)
The mother and father differ sharply as to the father’s fitness as a person and parent, and as to his past attention to, and interest in the infant, since his leaving New York State in December, 1974.
BACKGROUND
Permanent deprivation or suspension of civil rights is penal in nature. Rooted in English common law and in the Acts of Parliament (see Matter of Lindewall, 287 NY 347), such deprivation of rights became a matter of State statute, following the formation of the United States. However, such statutes must be consistent with the mandates of the United States Constitution and the Constitution of the affected States.
It has long been the history of New York jurisprudence to deny to convicted felons their civil rights, under the theory that it is the prerogative of the State to pass laws *667 when an individual acts contrary to the laws and mores of the State and, in doing so, to deprive that individual of certain civil rights enjoyed by other law-abiding citizens.
The Legislature of New York has, in its wisdom, enacted section 79 of the Civil Rights Law which divides those subject to civil rights deprivation or suspension into two categories: one, those deprived permanently by being declared civilly dead (Avery v Everett, 110 NY 317); and two, those felons who serve their sentences in a State correctional institution and who are sentenced there for more than one day. This second group of felons have their civil rights suspended for the period of the sentence, regardless of any possible parole, unless their civil rights are restored, at the discretion of a court of law upon petition of the felon (Civil Rights Law, § 79, subds 1, 2).
This court initially determines that section 79 of the Civil Rights Law applies to a change of name proceeding under article 6 of that same Civil Rights Law and specifically to the notice and consent provisions therein, namely, sections 62 and 63.
It is relevant to note that constitutional challenges to section 79, as affecting section 111 (subd 2, par [d]) of the Domestic Relations Law (persons deprived of civil rights — consent to adoption) have, in most instances, failed. (Matter of Ginnan, 101 Misc 2d 853 [case involving procedural and substantive due process challenges to the equal protection of the laws clauses of the Fourteenth Amendment to the United States Constitution and the Constitution of the State of New York, not successful]; Matter of Anonymous, 104 Misc 2d 985 [involving cruel and unusual punishment of the Eighth Amendment and the Fourteenth Amendment to the United States Constitution, and sections 5, 6 and 11 of article I of the New York State Constitution, not successful].) However, see Caban v Mohammed (441 US 380) where discrimination against unwed fathers was determined to exist where the statute required only the natural mother’s consent to the adoption of an illegitimate child (Domestic Relations Law, § 111, subds 1, 2).
It appears to this court that section 79, as applicable to name changes, is constitutional in all respects as a proper exercise of the police power vested in the State.
*668 Examination of the father’s felony conviction and sentences in State v Ga Donna (Madison County, Ga, No. 6500G), leads the court to conclude that the father’s conviction in Georgia was for crimes which, under New York law, would constitute felonies and would therefore fall within the civil rights suspension provisions of subdivision 1 of section 79 of the Civil Rights Law.
NOTICE (PROCEDURAL DUE PROCESS)
This point is quickly disposed of as petitioner did give the incarcerated father notice of the proposed name change — which notice drew the father’s opposition under consideration. Thereafter, this court has given the father every opportunity to present his position in opposition to the application. It should, nevertheless, be noted that the change of name statute (Civil Rights Law, art 6, §§ 60-64) is silent with respect to notice to an incarcerated parent. The notice provision (§ 62), in relevant portion, merely states the notice must be given to “(a) both parents of the infant, if they be living, unless the petition be made by one of the parents, in which case notice must be served upon the other, if he or she be living” (emphasis supplied). This court is compelled to hold that a parent whose civil rights have been forfeited and/or suspended under section 79 of the Civil Rights Law is not “living” within the meaning of section 62. However, this court agrees with the limited decisional law of this State which has recognized through the exercise of inherent power that incarcerated parties have a right to notice of a change of name application affecting their children. This power comes from a careful reading of the necessary concerns of the court as set forth in the requirements of a change of name order (Civil Rights Law, § 63) “that the interests of the infant will be substantially promoted by the change”. Without question, notice to an affected parent might well invite information helpful to the court in determining whether the best interests of an infant might be served by a proposed name change. Such advice should be invited by any responsible court (Matter of Fein, 51 Misc 2d 1012).
CONSENT (SUBSTANTIVE DUE PROCESS)
The change of name statute (Civil Rights Law, art 6, §§ 60-64) is also silent as to whether an incarcerated par *669 ent has any standing to consent or withhold consent with respect to a change of name application.
As to the right of consent to an incarcerated parent to the more drastic matter of adoption, it is relevant to note, that the State adoption statute (Domestic Relations Law, § 111), Social Services Law, and Correction Law have recently been amended with respect to the termination of parental rights of an incarcerated parent (L 1983, ch 911, approved Aug. 8, 1983, eff Jan. 1, 1984).
By this amendment, the Legislature has eliminated the long-standing automatic termination of parental rights, based solely upon the status of incarceration and has formulated procedural and substantive due process requirements in order to protect an incarcerated parent from termination and set forth provisions for termination where a parent-child relationship has ceased to exist. This court believes that the legislative findings, declaration, and standards of nontermination and termination as set forth in chapter 911 “Prisoners-Parental Rights-Termination” (Incarcerated Parents Law), dealing with adoption where changes of name are many times included is very relevant to change of name proceedings. The realistic and humane philosophical procedural and substantive standards, therein, should be read into any change of name application under article 6 of the Civil Rights Law. These relevant legislative findings and declaration, in total, state: “Section 1. Legislative findings and declaration. The legislature finds that the incarceration of a parent presents special considerations in achieving a permanent and stable environment for a child. Further, the prevailing public policy to protect the natural parent’s rights and to terminate those rights where, for all practical purposes, the parent-child relationship has ceased to exist would be advanced by the revision of law governing the termination of parental rights of an incarcerated parent and the adoption of such parent’s child.” (L 1983, ch 911.)
The Legislature further finds that:
“(i) A parent who has been incarcerated and, as a result, has been deprived of his or her civil rights pursuant to the provisions of the civil rights law, should not, by that fact *670 alone, be deprived of his or her parental right to consent or withhold consent to the adoption of his or her child;
“(ii) A parent who has been incarcerated, however, does and should have an obligation to fulfill, while actually incarcerated, the requirement set forth in section three hundred eighty-four-b of the social services law, of visiting or communicating at least once every six months with the child or authorized agency. Having failed to fulfill such requirement, such parent should have his or her parental rights terminated upon the ground of abandonment pursuant to section three hundred eighty-four-b of the social services law;
“(iii) A parent who has been incarcerated should also fulfill, while actually incarcerated, the obligations of a parent as described in the provisions of section three hundred eighty-four-b of the social services law relating to the termination of parental rights upon the ground of permanent neglect. However, such ground of permanent neglect should recognize the special circumstances and need for assistance of an incarcerated parent to substantially and continuously or repeatedly maintain contact with, or plan for the future of his or her child. An incarcerated parent who has failed to fulfill these obligations may have his or her parental rights terminated upon such ground; and
“(iv) A parent who has been incarcerated also has an obligation to maintain substantial or frequent visits or communications with the child and having failed to fulfill that obligation, the parent should have his or her consent to adoption dispensed with pursuant to section one hundred eleven of the domestic relations law.
“The intent of this act is to revise the social services law and domestic relations law so that such laws are consistent with the above legislative findings, and to confirm the prevailing interpretation of section three hundred eighty-four-b of the social services law that the tolling provisions of such section relating to permanent neglect are not applicable to the provisions of such section relating to abandonment.” (L 1983, ch 911, § 1; emphasis supplied.)
With respect to notice, this court determines to exercise its “inherent powers” and adopt the spirit and substance of *671 the “Incarcerated Parent Law,” and hold that an incarcerated parent should have the right to have his consent, or withholding of consent, carefully considered as an important factor by any court considering a change of name application. Therefore, the father’s substantive rights to due process seem to be satisfied by this court without regard to the silent statute.
BALANCING OF INTERESTS
After all the procedural and substantive rights of the interested parties have been accommodated, and it is this court’s firm belief that, such as occurred herein, it is the court’s ultimate responsibility to carefully balance the conflicting interests represented by the petitioner mother and the incarcerated father, and determine whether “the interests of the infant will be substantially promoted by the change” (Civil Rights Law, § 63).
Keeping in mind the recently stated attitude of the Legislature in the “Incarcerated Parents Law” and those expressed some time ago by the Appellate Division in Matter of Ekstrom (24 AD2d 276, 280), “Neither the ties of blood and parenthood nor the moral and temporal interests of the child are absolutes * * * Each case must proceed to decision upon sound and careful consideration of its particular facts, with full recognition of the primacy of parental rights unless and until there shall be submitted convincing proof that they have been substantially eroded by abuse, by misconduct or by circumstances”, this court has made a most careful investigation in satisfaction of its responsibility. It has reviewed the notice of petition and petition, and supporting documentation of the mother; considered the written objections of the father, and petitioner’s memorandum of law; initiated telephone calls and correspondence with the Georgia Department of Offender Rehabilitation and Stewart County Correctional Institution; conferred with and interviewed the mother, and the infant (attended by the mother’s attorney); corresponded with the father, including offering the suggestion that he change his name back to his former name, still used by his daughter; obtained and reviewed a certified copy of the father’s indictment, conviction and sentences from Superior Court of Madison County, Georgia; corresponded with the father’s *672 attorney in Lumpkin, Georgia, regarding the father’s change of name; reviewed the decree of the Superior Court for the County of Stewart, Georgia, changing the father’s name; conducted correspondence and communication with petitioner’s attorney.
CONCLUSIONS
This court, in carefully weighing all relevant interests, concludes that at this time, petitioner has not established a compelling reason for the proposed name change, nor has it been satisfactorily established that this 10-year-old daughter’s “interests * * * will be substantially promoted by the change” (Civil Rights Law, § 63; cf. Matter of Fein, 51 Misc 2d 1012, supra; Matter of Yessner, 61 Misc 2d 174).
Deprivation of a father’s surname is a serious and far-reaching action, more so in our American society with respect to a male child that normally carries a surname throughout life, but still an important basic right with respect to a daughter. Such change should not be sanctioned except where supported by compelling reasons (Matter of Yessner, supra; Matter of Pollack, 2 AD2d 756; Matter of Biegaj, 25 NYS2d 85; Matter of Baldini, 17 Misc 2d 195; Smith v United States Cas. Co., 197 NY 420; Matter of Epstein, 121 Misc 151; Matter of Cohn, 181 Misc 1021).
This court finds, from the record before it, that the father here has been less than an admirable person, either as a former husband or as a father. However, this court also finds that the relationship between the father and daughter has not eroded to the degree which would call for termination of parental rights under the tests set forih in the recently enacted “Incarcerated Parents Law.” On the contrary, and under the circumstances of his incarceration, the father has attempted to maintain substantial communication with the daughter. This was illustrated by the father having his daughter brought to see him in prison by his parents in August of 1983, when the daughter was staying with the father’s parents, her paternal grandparents, in the State of Florida. The record also includes recent evidence regarding the father’s incarceration adjustment which this court deems as encouraging. On March 5, 1984, this court was advised by the Stewart County Correctional Institution:
*673 “In regards to your letter about inmate Thomas Ga-Donna, it is my opinion that Mr. GaDonna has used his time in prison to his advantage in that he has completed his GED and has some credits toward College degrees. He has also participated in OJT programs and received several Performance Notices for excellence in the performance of his duties and is now a Trusty.
“In general, Mr. GaDonna’s conduct and attitude has been good and he seems to be receptive to any self-help programs available.
“At present Mr. GaDonna’s tentative parole date is December 1985, but this is at the direction of the State Board of Pardons and Paroles, who may consider this inmate for an early release.
“Mr. GaDonna has had his name changed back to Thomas James Petras as of January 31, 1984. Please find enclosed copies of the Petition to change his name and the Certificate of Change of Name.”
Having in mind the well-being, social development and welfare of this 10-year-old girl, and the continuing interest of the father in her, this court believes that it would be better to delay any change of surname until the child has reached a greater degree of maturity and understanding (Matter of Biegaj, supra; Smith v United States Cas. Co., supra).
Accordingly, the application is denied. Any future change of name application, as long as the father remains incarcerated, should reflect the considerations suggested by the “Incarcerated Parents Law”, a copy of which will be forwarded to both the mother’s attorney and the father.