OPINION OF THE COURT
William R. Geiler, J.
Plaintiff moves for an order modifying a certificate of live birth issued for the infant issue of the marriage which was *317 filed with the New York State Department of Health on July 23, 1985. On said certificate, the child’s name was listed as Krystle DeSalvio-Rio, DeSalvio being the mother’s maiden name and Rio being the father’s surname. Plaintiff seeks an order amending said birth certificate to eliminate the mother’s maiden name therefrom, and directing defendant to refrain from using any surname other than the father’s for this child on any school, religious or other documents.
The child in question, Krystle, was born on July 18, 1985, at which time plaintiff was not residing at the marital residence. In fact, he contends that defendant kept the actual event of the birth of the daughter a secret from him. Also, he contends that she neither consulted him nor attempted to gain his consent when she gave the child the hyphenated surname. Finally, he contends that it is a time-honored right that a newborn child born in wedlock bear the surname of the father. Defendant, on the other hand, in addition to asserting her rights to equal protection and equal parenting, contends that she never, herself, adopted her husband’s surname upon marrying him, and that plaintiff is not supporting the child. It further appears that plaintiff was present at the time of the child’s birth.
For the reasons set forth below, the court denies the instant motion in all respects.
Most American children born in wedlock are given their father’s surname. (Note, Like Father, Like Child: The Rights of Parents in Their Children’s Surnames, 70 Va L Rev 1303, 1304 [1984] [hereinafter referred to as Note, Like Father, Like Child].) However, at common law, no one has a property right to a personal name such that one can keep another from using it. (Arnold, Personal Names, 15 Yale LJ 227-228 [1905-1906].) Consistent with the right to change one’s name is the right not to change it at marriage as many women traditionally have done. (See, e.g., Bysiewicz & MacDonnell, Married Women’s Surnames, 5 Conn L Rev 598 [1973]; Daum, Right of Married Women to Assert Their Own Surnames, 8 U Mich JL Ref 63 [1974]; Karst, "Discrimination So Trivial”: A Note on Law and Symbolism of Women’s Dependency, 35 Ohio St LJ 546 [1974].)
Most courts recognize that the father has no common-law right to determine his child’s surname and find support for the paternal name presumption in natural law. In name change cases, for example, courts use the idea of natural law *318 in two ways. Some courts speak of the father’s "primary” or "fundamental” right. "The father * * * has a natural right to have his son bear his name”. (Matter of Baldini, 17 Misc 2d 195 [City Ct, Bronx County 1959]; see, Worms v Worms, 252 Cal App 2d 130, 60 Cal Rptr 88 [1967]; West v Wright, 263 Md 297, 283 A2d 401 [1971]; De Vorkin v Foster, 66 NYS2d 54 [Sup Ct, Kings County 1946]; Matter of Yessner, 61 Misc 2d 174 [Civ Ct, Kings County 1969]; Young v Board of Educ., 114 NYS2d 693 [Sup Ct, Kings County 1952] ["fundamental right”]; Schoenberg v Schoenberg, 57 NYS2d 283 [1945], mod 269 App Div 1048 [2d Dept 1945], affd 296 NY 583 [1946] ["primary right”].) Other courts refer to the father’s "time-honored right” (see, e.g., Matter of Wachsberger, NYLJ, June 28, 1982, p 16, col 2 [Sup Ct, Nassau County, Burke, J.]) and use the concept of natural law to convey the understanding that any practice universal among human societies must be innate, a "law of nature”. Commentators contend, however, that the confidence of State courts that the paternal name is a right confirmed by common practices is misplaced. (Note, Like Father, Like Child, op. cit., at 1321; MacDougall, Right of Women to Name Their Children, 3 Law & Inequality 91 [1985]; Note, Parents’ Selection of Children’s Surnames, 51 Geo Wash L Rev 583 [1983].)
Examination into the naming practices of Western civilization reveals that names ordinarily express kinship, but not necessarily paternity. Matronymics, names derived from the maternal line, have been employed in several Western cultures, including modern Spain (see, Secretary of Commonwealth v City Clerk, 373 Mass 178, 180, 366 NE2d 717, 720 [1977]) and medieval England (Reaney, Dictionary of British Surnames, at xliii-xlv [1958]). Medieval Arabs and Jews also used matronymics (see, Goitein, Nicknames as Family Names, 90 J Am Oriental Socy 517, 522-523 [1970]). The Chinese characters for "to have a surname” is composed of the characters for "woman” and "to be born” (Defrancis, Character Text for Beginning Chinese, at 5, 11, 99 [1964]). In England, at least as late as the 14th century, both sons and daughters adopted their mother’s surnames, often upon succeeding to their mother’s estate or in the hope of doing so (Reaney, Origin of English Surnames, at 84 [1968]). Men also adopted their wives’ surnames if the couple inherited property from the woman’s family (Homans, English Villagers of Thirteenth Century, at 187 [1941]). The children of such couples, presumably, also took their mother’s surnames (Note, Like Father, Like Child, *319 op. cit., at 1322). Concise and fascinating histories of the practices in naming children are to be found, in addition to the above-cited works and law review articles, in two early New York decisions, Matter of Snook (2 Hilt 566 [1859]) and Smith v United States Cas. Co. (197 NY 420 [1910]).
Referring to what is perceived to be the Anglo-American custom, some courts eschew natural law and simply rely on the conservative philosophy that a custom should not be discontinued save in extraordinary circumstances (see, e.g., Carroll v Johnson, 263 Ark 280, 286, 565 SW2d 10, 14 [1978]; Montandon v Montandon, 242 Cal App 2d 886, 891, 52 Cal Rptr 43, 46 [1966]; West v Wright, 263 Md 297, 300, 283 A2d 401, 402 [1971], supra). It has been held that courts may take judicial notice of well-known facts concerning the habits and activities of human beings (Richardson, Evidence § 42 [10th ed 1973]). Among these well-known facts is the practically universal custom of giving a child the father’s surname. Equally well known is the fact that a surname provides a means of identifying the child with the father’s family (Bennett v Northcutt, 544 SW2d 703, 707 [Tex Civ App 1976]).
In New York, it has been held that although a father has a recognized interest in having his child bear his surname, neither parent has a superior right to determine the surname of the child, and the question is always whether the best interests of the child will be served by a proposed change (Cohan v Cunningham, 104 AD2d 716 [4th Dept 1984]).* Depriving a child of his or her father’s surname is normally a far-reaching action, and applications for a change of an infant’s surname are usually granted only where the natural father is guilty of misconduct, abandonment or lack of support (Matter of Goldstein, 104 AD2d 616 [2d Dept 1984]; Matter of Petras, 123 Misc 2d 665 [Civ Ct, Queens County 1984]; Matter of Determann, NYLJ, Feb. 23, 1982, p 13, col 1 [Sup Ct, Nassau County, Balletta, J.]). Here, however, the court is faced with a situation involving the naming of a child nearly at birth, and where the father has not totally been deprived of having his child bear his surname.
It appears that the parental surname custom has sought to serve four major purposes:
*320 (1) Ease of inheritance;
(2) Governmental convenience;
(3) Genealogical and historical convenience; and
(4) Promotion of marriage and family life.
With regard to the issue of ease and inheritance, some contemporary American courts have declared that this reason continues to justify an exclusively paternal surname (Matter of Harris, 160 W Va 422, 427, 236 SE2d 426, 429 [1977]; see also, D.R.S. v R.S.H., 412 NE2d 1257, 1263 [Ind App 1980]). In Harris, the West Virginia Supreme Court outlined the financial benefits accruing to children from their fathers: Social Security, G.I. benefits, insurance, real property and goodwill in a family business. The court conceded, "Of course, all of these benefits could theoretically pass through the female line as well as the male line, but it is not customary.” (Matter of Harris, supra, at p 427, at p 429.) A paternal surname presumption may have been accurate in the eighteenth and nineteenth centuries when married women could neither contract nor control their own wealth and no child could inherit from his mother. After the Married Women’s Property Acts were enacted in the latter half of the nineteenth century, however, married women in America, like their fourteenth century English predecessors, were able to contract and to hold property. It is well known that many women now work outside the home and own significant property, and, consequently, an exclusively paternal naming system is no longer warranted on the theory of ease of inheritance.
With regard to the issue of governmental convenience, the United States Supreme Court has held that "any statutory scheme which draws a sharp line between the sexes, solely for the purpose of achieving administrative convenience, necessarily commands 'dissimilar treatment for men and women who are * * * similarly situated,’ and therefore involves the 'very kind of arbitrary legislative choice forbidden by the [Constitution]’ ” (Frontiero v Richardson, 411 US 677, 690 [1973], quoting Reed v Reed, 404 US 71, 77 [1971]). Moreover, the paternal surname preference is not necessarily convenient for the State. Firstly, there appears to be no inconvenience with officials and workers in the New York State Department of Health since they will accept for recording, certificates of live birth with any surname given by a parent or parents (telephone interview with F. Pierce, principal clerk, Birth Amendment Unit, New York State Department of Health, *321 Apr. 24, 1986). Even if the task of a registrar of births would be eased by a paternal surname presumption, such a presumption has obviously increased judicial involvement in name change applications (see, Secretary of Commonwealth v City Clerk, supra). Notoriously absent from any discussion of convenience is the inconvenience to custodial mothers who must explain to pediatricians, teachers, school administrators, insurance companies, welfare workers and college financial aid officers that a child is hers despite their differing surnames. It has been suggested, at least in the context of a divorced mother remarrying that a compound surname for a child would alleviate a mother’s difficulties in this regard without significant hardship to a father. (Note, Like Father, Like Child, op. cit., at 1328, n 125.)
With regard to genealogical and historical convenience, it has been stated that "the child should in due course know of his parentage” (Matter of Baldini, 17 Misc 2d 195 [City Ct, Bronx County 1959], supra; but see, Montandon v Montandon, 242 Cal App 2d 886, 892, 52 Cal Rptr 43, 46 [1966], supra; see also, Clinton v Morrow, 220 Ark 377, 383, 247 SW2d 1015, 1018 [1952]). However, given today’s technological advancements and the intricate and efficient computer systems available to the vital statistics recording authorities, the court cannot understand why the paternal line should be favored, even to the extinction of the maternal line.
Finally, with regard to the issue of promotion of marriage and family life, much of the litigation in this area involves the naming of children of unmarried parents (Doe v Hancock County Bd. of Health, 436 NE2d 791, 795 [Ind 1982, Hunter, J., dissenting]; Matter of Brooks v Willie, 117 Misc 2d 640 [Fam Ct, Suffolk County 1983]). The State of Indiana in Doe suggested that its statute requiring children of unmarried parents to bear their mothers’ surnames promoted marriage and family life. Yet, many married couples challenging other States’ surname statutes have sought to give their child the mother’s surname, either alone or in conjunction with the father’s surname. (See, e.g., Sydney v Pingree, 564 F Supp 412, 413 [SD Fla 1982] [fused combination]; O’Brien v Tilson, 523 F Supp 494, 495 [EDNC 1981] [hyphenated combination]; Jech v Burch, 466 F Supp 714, 715 [D Hawaii 1979] [fused combination]; Rice v Department of Health & Rehabilitative Servs., 386 So 2d 844, 851-852 [Fla Dist Ct App 1980, Booth, J., dissenting].) A State could make a more convincing argument that a statute restricting the choice of children’s surnames *322 promotes marriage and family life if the statute required parents to give their children either the mother’s surname, the father’s surname, or a hyphenated combination of both. It has been suggested, however, that given the many variations in family situations that exist in "today’s America”, the State’s promotion of identity of surnames within a family is impracticable: a statute requiring uniformity in naming children cannot meet the needs of all families. (Cf. Moore v East Cleveland, 431 US 494, 508-510 [Brennan, J., concurring] [1977].)
Against the aforementioned and outdated reasons for the paternal surname presumption is the issue of equal protection to a mother. Today, few American mothers are aware that they are not legally required to give their children their fathers’ surnames. The Supreme Court recently noted in Lehr v Robertson (463 US 248 [1983]) that a State’s decision to choose a rule that systematically harmed women could be explained only as the product of habit or as the product of an invidious and indefensible stereotype, and such decisions are inimical to the norm of impartial governments. In addition to denying mothers equal protection of property and contract law, the concept of a vested paternal surname presumption denies mothers equal parental rights. (Note, Like Father, Like Child, op. cit., at 1337; see also, Donald J. v Evna M.-W., 81 Cal App 3d 929, 937, 147 Cal Rptr 15, 20 [1978].) The Supreme Court has held as a matter of constitutional law that parents who have taken responsibility for the child have equal decisional rights respecting that child. In Caban v Mohammed (441 US 380 [1979]), for example, the court found that a State statute violated the equal protection clause by granting an unwed mother a veto over an adoption while denying veto power to a father who had admitted paternity and had helped care for the children. Accordingly, equal protection arguments against a paternal surname presumption are most persuasive, and some States have statutes which provide that parents have equal rights with respect to their children. (See, Note, Like Father, Like Child, op. cit., at 1338, n 163; Domestic Relations Law § 111.)
The need to preserve the father-child bond is a reason most often given for the paternal surname presumption. (See, e.g., In re Marriage of Presson, 102 Ill 2d 303, 312, 465 NE2d 85, 89 [1984]; West v Wright, 263 Md 297, 302-303, 283 A2d 401, 404 [1971], supra; Firman v Firman, 187 Mont 465, 610 P2d 178, 181 [1980]; but see, Don v Don, 142 Conn 309, 114 A2d 203 *323 [1955].) Some courts believe that merely adding the mother’s name to the child’s surname will cause the father to lose all interest, or at least some interest, in the child. (See, e.g., Carroll v Johnson, 263 Ark 280, 287-288, 565 SW2d 10, 15 [1978], supra.) These courts recognize the anguish of a father who has lost the greater part of the companionship of and authority over his children, a loss particularly devastating if the father had himself moved for custody but was not awarded it. Sex roles in America have changed drastically during the past 25 years. Women, traditionally confined to the home, are now being afforded more opportunities and legal protections in the workplace then even before. (See generally, McGlen & O’Connor, Women’s Rights: The Struggle for Equality in the Nineteenth and Twentieth Centuries, at 149-195 [1983].) In one important area, however, the law has failed to keep up with society’s changes in that men have not been afforded an equal opportunity to take part in homemaking and child care, nor have they been provided with the legal protection enabling them to do so. (See, Note, Fathers and Families: Expanding Familial Rights of Men, 36 Syracuse L Rev 1265, 1266 [1986].) The innate motherhood concept is dying more slowly in the legal community than in the social-science arena. Based upon the belief that children need to be nurtured by a mother or at lease a consistent mother substitute lest they suffer from maternal deprivation, a tender years presumption developed that favored women for the custody of children of a tender age.
The tender years presumption was introduced in American law in 1880 by a Pennsylvania court (Commonwealth ex rel. Hart v Hart 14 Phil Rep 352, 357 [1880]), adopted by a New York court in 1912 (see, Ullman v Ullman, 151 App Div 419 [2d Dept 1912]), and exalted to utmost importance in a 1938 Missouri decision where the court stated that "[t]here is but a twilight zone between a mother’s love and the atmosphere of heaven, and all things being equal, no child should be deprived of that maternal influence”. (See, Tuter v Tuter, 120 SW2d 203, 205 [Mo Ct App 1938].) Currently, however, three fourths of the American jurisdictions have completely rejected the tender years presumption, either by statute or judicial determination. (See, Foster & Freed, Divorce in the Fifty States: An Overview, 14 Fam LQ 229, 263-264 [1981].) In these jurisdictions, neither parent is presumed to be better able to serve the best interests of the child. (People ex rel. Watts v Watts, 77 Misc 2d 178, 180-182 [Fam Ct, NY County 1973].) *324 The tender years presumption has been replaced with a standard based purely on the best interests of the child (Friederwitzer v Friederwitzer, 55 NY2d 89 [1982]; Eschbach v Eschbach, 56 NY2d 167 [1982]; see also, Neis v Neis, 3 Kan App 2d 589, 599 P2d 305 [1979]).
Despite this change in the law, however, it has been noted that 90% of all children of divorce are still in the custody of their mothers. (Note, Fathers and Families, op. cit, at 1274.) Frequently this is not because fathers have lost custody battles, but, rather, because they failed to fight them. (See, Polikoff, Why Mothers are Losing: A Brief Analysis of the Criteria Used in Child Custody Determinations, 7 Women’s Rights L Rptr 235, 236 [1982].) There are many men, and even well-respected attorneys-at-law who represent men who feel that custody litigation is an uphill struggle for men. There is another common myth that a man who seeks custody of his children only does so for the purpose of intimidating the wife into accepting a lesser financial settlement. Accordingly, frequent visitation and the fact that the child bears his surname often becomes the last indicia of meaningful association with his child.
In the instant proceeding, the court holds that, given the theories of equal protection and the right of equal parenting, defendant herein has done nothing to prejudice the right of the father to bear his surname. As noted above, neither parent has a superior right to determine the surname of a child (Cohan v Cunningham, 104 AD2d 716, supra). It is only right to note, however, that the court’s decision might have been different had defendant given the child her own surname, and not the hyphenated name that she did.
This decision should not open the floodgates to various and voluminous name change applications. The court notes with great particularity that the subject child has not yet attained the age of one year, and that the father’s willingness to support his child is gravely in doubt. For older children, Judges have proposed different and frequently conflicting subjective factors for deciding whether a particular name is in a child’s best interest. (See, e.g., Laks v Laks, 25 Ariz App 58, 60-61, 540 P2d 1277, 1279-1280 [1975]; In re Schiffman, 28 Cal 3d 640, 647-648, 620 P2d 579, 583 [1980]; Matter of G.L.A., 430 NE2d 433, 435 [Ind Ct App 1982, Sullivan, J., concurring]; Hall v Hall, 38 MD App 214, 228, 351 A2d 917, 926 [1976]; Matter of Saxton, 309 NW2d 298, 301 [Minn 1981], cert denied 455 US 1034 [1982]; Kirksey v Abbott, 591 SW2d 751, *325 752 [Mo Ct App 1979]; Cohee v Cohee, 210 Neb 855, 860, 317 NW2d 381, 384 [1982]; In re Lone, 134 NJ Super 213, 220, 338 A2d 883, 887-888 [1975]; Flowers v Cain, 218 Va 234, 236-237, 237 SE2d 111, 113 [1977].) Moreover, courts disagree whether disputes over the initial naming of a child should be resolved using the same standard as that used in resolving disputes over changing a child’s name. (Compare, Webber v Parker, 167 So 2d 519, 522 [La Ct App 1964] [different criteria and procedures], writ denied 246 La 886, 168 So 2d 269 [1965], with Hurta v Hurta, 25 Wn App 95, 96, 605 P2d 1278, 1279 [1979].)
Whatever standards are to be adopted in New York should be adopted only after careful examination of equal protection and equal parenting rights as against the other criteria noted in this decision. If young adults with hyphenated names marry and have children, do these children now take on a maximum of four surnames? With hyphenated surnames, does one party’s surname always appear before the other’s? Will recording and other institutions where records are kept drop a second name within its internal practices for ease in administration? The potential problems that could arise in this area with a strict equal protection standard could be numerous and comical.
Accordingly, this motion is denied in all respects.

 It has also been held that the best interest of a child being the focal point in a support proceeding, there is no basis in law or reason to condition a duty of support upon a child’s bearing the surname of the payor parent. (Matter of Bell v Bell, 116 AD2d 97 [3d Dept 1986].)