**In re the MARRIAGE OF Rhonda Lynn GULSVIG and Ronald Gerald Gulsvig.**

**Upon the Petition of Rhonda Lynn Gulsvig, Appellee,**

**And Concerning Ronald Gerald Gulsvig, Appellant.**

No. 92–607.

Supreme Court of Iowa.

April 21, 1993.

As Corrected on Denial of Rehearing June 11, 1993.

Eric Borseth, Pleasant Hill, for appellant.

Rhonda Lynn Acosta, pro se.

SCHULTZ, Justice.

This is an appeal from a district court's decree dissolving the marriage of Rhonda Lynn Gulsvig and Ronald Gerald Gulsvig. In a nunc pro tunc order, Rhonda's surname was changed to Acosta. Prior to the decree, a child was born to the parties. Acting alone, Rhonda had the name James Joseph Acosta entered on the child's birth certificate. The trial court awarded joint custody of James to the parties but gave Rhonda primary physical care of the child. On appeal, Ronald challenges the provision for visitation, the amount of child support, and the refusal of the trial court to change the child's surname to Gulsvig. We affirm the decree dissolving the marriage, but modify the terms of the decree.

The parties had lived together since February 1990 and were married on January 5, 1991. They separated in April 1991 and a trial on the Dissolution of Marriage Petition was held in September 1991.

Ronald, age twenty-five at the time of trial, is a high school graduate and a navy veteran. He resides with his mother and has primary physical care of his four-year-old daughter from an earlier marriage. Ronald is employed as a manager of a convenience store.

Rhonda, age twenty-six at the time of trial, is a high school graduate. She finished vocational-technical schooling to become a licensed-practical nurse and is employed in that field. Rhonda also has custody of another child from a previous marriage. We will discuss other pertinent facts as we address each issue.

I. *Visitation.* The trial court ordered that Ronald shall have visitation with James on alternating Saturdays and Sundays from 1:00 p.m. until 5:30 p.m. until James is eighteen-months old. At that time, Ronald is entitled to visitation every other week-end from 1:00 p.m. on Saturday until 5:30 p.m. the next day. When James becomes three years of age, Ronald is entitled to an additional one week summer visitation; at age five, summer visitation is increased to four weeks.

Ronald urges that this visitation is too limited and more restrictive than Rhonda originally requested. He requests immediate overnight visitation rights, mid-week visitation, alternating holidays, and two to four weeks visitation during the summer.

In our de novo review, we find that almost all of the suggestions set out in Rhonda's brief regarding visitation are in the best interest of the child. We order that Ronald may have visitation with his son as follows:

1.  Every other weekend from 6:00 p.m. on Friday to 6:00 p.m. on Sunday.
2.  Alternating holidays which shall include New Years, Easter, Memorial Day, Fourth of July, Labor Day,

Thanksgiving, and Christmas. All holidays will be defined to begin at 6:00 p.m. on the eve of the holiday and end at 6 p.m. on the holiday, with the exception of Christmas.

Christmas shall be shared by both parents on an alternating basis. Ronald's visitation shall begin at 9:00 a.m. to 4:00 p.m. on Christmas Day one year, and begin at 4:00 p.m. on Christmas Eve and end at 9:00 a.m. on Christmas Day the alternate year.

Additionally, the child will be with Ronald every Father's Day from 9:00 a.m. to 8:00 p.m., and be with Rhonda every Mother's Day, regardless of the previous provision.

3. Ronald shall have a two-week summer visitation with the child when he becomes two years of age, and a four-week summer visitation when the child becomes five years of age, subject to the provision that the visitation should not exceed a two-week period at any time.

Ronald shall give notification of his planned summer visitation by May 1st of each year.

We reject Ronald's suggestion that he should have midweek visitation rights and be given the first option to babysit for James. This does not prevent the parties from agreeing to make these arrangements; however, only Rhonda should instigate discussion on the subject.

II. *Amount of support.* The trial court set Ronald's child support at $47 per week. Rhonda provides James' health insurance. The parties do not dispute that Rhonda's income after taxes is $1,082 and Ronald's income after taxes is $909 per month. The court used the child support guidelines for one child, amounting to 22.5 percent of Ronald's income, to arrive at the support award.

■ Ronald urges that the trial court failed to account for his support obligation to his daughter.[1] He receives no assistance in support for her. He maintains that his income should be reduced by the amount that he would be required to pay for his daughter if she were in her mother's custody. Ronald's argument runs contrary to our "child support guidelines." The guidelines allow a deduction from gross income for "child support ... actually paid pursuant to court or administrative order" Supreme Court Order in the Matter of Child's Support Guidelines (September 29, 1989). This is not to say that the trial court could not consider Ronald's expenses for the support of the child within his custody. Those expenses are germane in determining his financial ability to pay, *Gilley v. McCarthy,* 469 N.W.2d 666, 668 (Iowa 1991), and may justify deviation from the support as determined by the guidelines.

■ In our de novo review, we cannot find special circumstances that would justify a deviation from the guideline amount. The court file, provided on appeal, does not contain a financial statement prepared by Ronald showing his personal expenses. Neither do we find such information in the testimony. Our guidelines create a rebuttable presumption that the amount of child support resulting from the application of the guidelines is the correct amount of child support to be awarded. *Id.* Ronald has failed to present evidence of any special circumstances which would rebut this presumption. We affirm the child support award.

III. *Name of the child.* Ronald challenges the trial court's ruling denying his request to change James' surname to Gulsvig. After an evidentiary hearing, the trial court's only finding was "[t]he child will probably spend the bulk of his time with the custodial parent and be involved in family situations with the petitioner [Rhonda]." The court then concluded it would be in the best interest of the child to maintain the surname of Acosta.

■ We first determine whether the trial court is authorized to change the name of a child in a dissolution action. In recent years, we have decided several instances

1. Ronald also argues that the guidelines violate certain constitutional protections. However, he neither raised this issue at trial nor in his post-

trial motions. On appeal, we cannot review an issue not presented to the trial court. *Beitz v. Horak,* 271 N.W.2d 755, 759 (Iowa 1978).

involving subject matter jurisdiction in dissolution cases. Iowa Code chapter 674 (1991)[2] provides authority and direction in changing the names of adults and minors. Where other Iowa Code chapters provide exclusive jurisdiction, we have held the dissolution court lacks subject matter jurisdiction to enter orders involving the other remedy. *In re Marriage of Carrico,* 284 N.W.2d 251, 255 (Iowa 1979) (dissolution court may not direct Department of Social Services (DSS) to terminate parental rights); *In re Marriage of Snyder,* 276 N.W.2d 402, 406 (Iowa 1979) (dissolution court could not find child to be in need of assistance within meaning of Iowa Code section 232.61(1) (1979)).

We have also held the dissolution court lacked subject matter jurisdiction to expand authority of an administrative agency beyond that established by statute. *Iowa Dep't of Social Serv. v. Blair,* 294 N.W.2d 567, 570 (Iowa 1980) (dissolution court may not order DSS to maintain involuntary protective supervision over minor children of the parties); *accord, In re Marriage of Corbin,* 320 N.W.2d 539, 542 (Iowa 1982) (dissolution court has authority to place temporary custody with DSS where DSS has consented to its custody and supervision). However, these cases are not dispositive because chapter 674 does not specify that its remedy is exclusive and does not involve an administrative agency.

Other jurisdictions have addressed the issue of whether a dissolution court has authority to change the name of a child. Nebraska has a statute that gives its courts authority "to include such orders in relation to any minor children and their maintenance as shall be justified...." Relying on this statute and its equity jurisdiction, it held it had authority to change a child's surname in a dissolution action. *Cohee v. Cohee,* 210 Neb. 855, 317 N.W.2d 381, 384 (1982). *See also In re Marriage of Presson,* 102 Ill.2d 303, 80 Ill.Dec. 294, 296, 465 N.E.2d 85, 87 (1984) (child's name is a matter incident to custody of child and divorce court has subject matter jurisdiction); *In re Marriage of Nguyen,* 684 P.2d 258, 260 (Colo.Ct.App.1983), *cert. denied,* 469 U.S. 1108, 105 S.Ct. 785, 83 L.Ed.2d 779

(1985) (dissolution court has common-law authority to change name); *Hall v. Hall,* 30 Md.App. 214, 351 A.2d 917, 922 (1976) (may change name in either statutory or judicial proceeding); *accord, Maria E. v. Anthony E.,* 125 Misc.2d 933, 481 N.Y.S.2d 227, 228 (N.Y.Fam.Ct.1984) (family court had authority to change name in paternity proceedings).

Other jurisdictions have denied a name change in a dissolution action holding that name change statutes provided the exclusive remedy. *Viola v. Fundrella,* 241 N.J.Super. 304, 574 A.2d 1036, 1038–39 (Ch. Div.1990); *Mayor v. Mayor,* 17 Conn.App. 627, 554 A.2d 1109, 1111 (1989); *Lone Wolf v. Lone Wolf,* 741 P.2d 1187, 1192 (Alaska 1987).

Our chapter on Dissolution of Marriage Act, Iowa Code chapter 598, provides authority to change a party's name, Iowa Code section 598.37, but does not provide specific authority to change a child's name. When we examine our custody statute, Iowa Code section 598.41, we believe that authority to change a child's name may be inferred. Section 598.41 provides the court with broad discretion in determining custody and the physical care of a child and expresses a preference for joint custody. Each custodian has equal participation in decisions affecting "the child's legal status." Iowa Code § 598.41(2). We believe an infant child's name is an incident of the child's "legal status." Accordingly, we hold the trial court possessed subject matter jurisdiction in this respect.

Ronald argues that the custom in this country has always been that a child born in lawful wedlock receives the surname of the father at birth. He points out that Acosta is the surname of Rhonda's second husband, who has no relationship to James. Ronald urges that the relationship between a noncustodial parent and child is precarious; therefore, this court should take extra steps to insure maximum physical and emotional contact between himself and the child. He urges that it is important for his son to realize that he is connected with his

**2.** All references are to the 1991 Iowa Code.

father and that the use of Gulsvig as his last name would verify this connection.

Rhonda urges that it would be in James' best interest to maintain the surname given him. She points out that Acosta is the same name as James' mother and sister and to retain this surname would maintain the appearance of a family unit.

■ We first address Ronald's claim concerning custom. Ronald cites cases or statutes supporting a principle of law or presumption that a child should bear the surname of his father. We agree with the holdings of other jurisdictions that the presumption that a child bear the surname of his father is outdated and therefore rejected. *In re Andrews by and through Andrews*, 235 Neb. 170, 454 N.W.2d 488, 491 (1990); *Application of Rossell by Yacono*, 196 N.J.Super. 109, 481 A.2d 602, 606 (Law Div.1984); *In re Marriage of Schiffman*, 28 Cal.3d 640, 169 Cal.Rptr. 918, 922–23, 620 P.2d 579, 583 (1980); *contra Overton v. Overton*, 207 Mont. 292, 674 P.2d 1089, 1091 (1983). This conclusion is similar to our repudiation of the inference that the best interests of young children are served by placing the children in their mother's custody. *In re Marriage of Bowen*, 219 N.W.2d 683, 688 (Iowa 1974). We observed that the "real issue is not the sex of the parent." *Id.* The trial court correctly determined that the real issue is the best interest of the child. Iowa Code § 598.41; *Cohee*, 317 N.W.2d at 384.

■ We also conclude the mother does not have the absolute right to name the child because of custody due to birth. *Petition of Schidlmeier by Koslof*, 344 Pa.Super. 562, 496 A.2d 1249 (1985); *see also Cohee*, 317 N.W.2d at 384 (no presumption exists in favor of custodial parent); *Jacobs v. Jacobs*, 309 N.W.2d 303, 305 (Minn.1981) (neither parent has superior right to determine initial surname of his or her child). Consequently, Rhonda should gain no advantage from her unilateral act in naming James.

Factors utilized in considering the best interest of the child are numerous. *See Andrews*, 454 N.W.2d at 492–93; *Application of Saxton*, 309 N.W.2d 298, 301 (Minn. 1981), *cert. denied*, 455 U.S. 1034, 72

L.Ed.2d 152 (1982). Here, the relevant competing factors are simple. This is not a case where a party seeks to change a surname given to a child by the agreement of both parties. The mother's surname is favored because the child is physically present in the mother's home along with a half-sister bearing the same surname. On the other hand, the father provides support, exercises visitation, and has a strong interest in the preservation of his parental relationship which could be weakened if the child did not bear his surname. When these facts nearly or do offset each other, judicial discretion must be exercised with caution and other solutions must be explored.

■ The parties considered, but could not agree, on another solution. The parties each testified that a hyphenated name was considered; however, the trial court did not address this solution. In recent years courts have recognized that a hyphenated name of both parents' surnames may best serve the interest of a child. *Andrews*, 454 N.W.2d at 493; *Rio v. Rio*, 132 Misc.2d 316, 504 N.Y.S.2d 959, 965 (N.Y.Sup.Ct. 1986); *Cohee*, 317 N.W.2d at 384; *Laks v. Laks*, 25 Ariz.App. 58, 61, 540 P.2d 1277, 1280 (1975). We believe that selecting a hyphenated name in this case would pour salt in the wounds of one or both of the parties and eventually would affect James. We reject this solution.

■ We have considered Rhonda's name changes in the past six years. We accept her assurance that she will retain the name Acosta if she remarries. Her suggestion that Ronald receive generous visitation provides an indication that she wants James to maintain strong ties with Ronald. This generous visitation mitigates Ronald's concern that he and James retain a strong relationship. If Ronald exercises the visitations afforded him, James will not lose this bond.

We, as did the trial court, find James' best interest will be served by retaining the surname Acosta. Accordingly, we affirm the trial court on this issue.

IV. *Summary.* In summary, we affirm the granting of the dissolution. We modify the visitation order. We affirm the child support order and the trial court's refusal to change the child's surname. We

further hold that Ronald shall pay one-half of the cost of this appeal.

**AFFIRMED AS MODIFIED.**

All Justices concur except HARRIS, J., who dissents, and McGIVERIN, C.J., and ANDREASEN, J., who join HARRIS' dissent, and SNELL, J., who dissents separately.

HARRIS, Justice (dissenting).

I also disagree with division III of the majority opinion, but on a basis different from that advanced in the other dissenting opinion. I have no quarrel with the majority's disapproval of the outdated rule that accorded fathers virtually absolute power to append their surname to a child, even when the parents' relationship was transitory.

As the majority concedes, a mother does not have unfettered discretion either. I think the rule should require the parent registering a surname for the child, in the absence of agreement by both parents, to select a surname used by one of the parents during their relationship. Such a rule would control this dispute because only the father's surname qualifies. Disputes where parents use different surnames would have to be resolved on a case-by-case basis, with a view of protecting each parent's relationship with the child and the child's best interests.

SNELL, Justice (dissenting).

I respectfully dissent from division III of the majority decision regarding the naming of the parents' child. The significance of this decision as a legal precedent is immense.

The importance of names in society is of ancient origin. Emperor Fuxi of China decreed the use of family names or surnames about 2852 b.c. Family names came into use in Roman times and again in Northern Italy in the 900s a.d. The Romans used three names, a given name, a clan name, and a family name (*e.g.*, Gaius Julius Caesar). The crusaders carried the custom of family names from Italy to other countries of Western Europe. 14 The World Book Encyclopedia 6 (1992).

The most important regulation regarding family names was made at the Council of Trent (1563). It decreed that every parish must keep complete registers of baptisms, with the names of the child and those of his or her parents and grandparents. There is not much early legislation thereafter because two basic assumptions were taken for granted: that the bride will accept the bridegroom's family name by marriage and that their children will automatically have the family name of the parents. 12 The Encyclopaedia Britannica 817 (15th ed. 1979).

Elsdon C. Smith in The Story of Our Names (1930) observed that except to the most intimate friends a person's name is the most prominent feature. It is also the most vulnerable point. An old Roman maxim runs, "Sine nomine homo non est" (without a name a person is nothing). One's name is a signboard to the world. It is one of the most permanent of possessions; it remains when everything else is lost; it is owned by those who possess nothing else. A name is the only efficient means to describe someone to contemporaries and to posterity. When one dies it is the only part that lives on in the world. *Id.*

Our common law and statutory law have long recognized the need for a stable system through which people are known. Chapter 144, Vital Statistics, sets out the requirements for registering births. If the mother was married, either at the time of conception or birth, the name of the husband shall be entered on the certificate as the father of the child. Iowa Code § 144.13. Our legislature has also provided the law for changing names. Iowa Code ch. 674. The change of a minor's name may not be made unless the requirements of section 674.6 on notice and consent by the parents are met. If one of the parents objects to the proposed name change, a court may waive the requirement of both parents consenting, if it finds the nonconsenting parent has abandoned the child or has been ordered to support or financially aid the child and has failed to do so without good cause. *See Gail v. Winemiller*, 464 N.W.2d 697 (Iowa App.1990). No such finding has been made in this case nor has

any such allegations been made that Ronald has been guilty of any misconduct.

This is not a change of name case; rather, it is a name case *ab initio*. Neither is this a Lucy Stone type case, yet, an implication is there. As a nineteenth century suffragist, she was the first American woman to establish her right to use her maiden name publicly after she had been married. Now, that right is acknowledged generally. *See* Annotation, *Right of Married Woman to Use Maiden Surname*, 67 A.L.R.3d 1266 (1975).

The instant case is not about women's rights; it is about equal rights. It does not affect or question, nor do I, a woman's right to choose a different name for herself in a divorce proceeding. Although the case does not involve the right of Rhonda to change her name from Gulsvig (her third husband's) to Acosta (her second husband's), she cites that as an important reason for not wanting her son to be named Gulsvig. In essence, she wants to project and expand her right to select a new name for herself after divorce, so as to consume her son's right to a true parental name, and totally exclude the child's father from any recognition. I believe that acceding to this claim is without legal support and is abrasively disruptive of family relationships.

I recognize that a child's mother has a right equal to that of its father to choose its name. But I do not believe a father's rights are forfeited by the mother's act of naming the child on the birth certificate without the father's knowledge or consent. A child's name should not be determined by the winner of a race to fill out the birth certificate.

Rhonda unilaterally named the child Acosta when her legal name was Gulsvig, the child's father indisputably was Ronald Gulsvig, and a pending divorce action had not been concluded. The trial court had subject matter and personal jurisdiction of the parties in the divorce action under chapter 598 to determine the legal name for the child.

Courts that have considered issues of name change for minors even when authorized by statute have exercised restraint. In *Robinson v. Hansel*, 302 Minn. 34, 36, 223 N.W.2d 138, 140 (1974), the Minnesota Supreme Court said: "[J]udicial discretion in ordering a change of a minor's surname against the objection of one parent should be exercised with great caution and only where the evidence is clear and compelling that the substantial welfare of the child necessitates such change." The Minnesota court reviewed that statement in 1981 and approved it again as a guideline. *In re the Application of Saxton*, 309 N.W.2d 298, 301 (Minn.1981), *cert. denied sub nom. Saxton v. Dennis*, 455 U.S. 1034, 102 S.Ct. 1737, 72 L.Ed.2d 152 (1982). In *Saxton*, the court held that the children's best interests were served by keeping their given surname. In *Jacobs v. Jacobs*, 309 N.W.2d 303, 305 (Minn.1981), the court held that neither parent has a superior right to determine the initial surname of their child so that the child's best interests must govern in resolving the quarrel between them as to the initial surname. In 1976, the Nebraska legislature enacted a statute restricting the naming of a newborn infant to the father's surname, mother's surname, mother's maiden surname or a hyphenated surname of both parents. Neb.Rev.Stat. § 71–640.01 (Cum.Sup.1980). In applying that statute, the Nebraska court said:

> Society has a strong interest in the preservation of the parental relationship. Even though a divorce decree may terminate a marriage, courts have traditionally tried to maintain and encourage continuing parental relationships. The link between a father and child in circumstances such as these is uncertain at best, and a change of name could further weaken, if not sever, such a bond.... The question of whether the name of a minor child should be changed is to be determined by what is in the best interests of the child. The cases which have considered this question have granted a change of name only when the substantial welfare of the child requires that the name be changed. *See* Annotation, 53 A.L.R.2d 914. Generally, where the father has supported the children and exercised his visitation rights relief has been denied. A change of name has been granted where the father's name was

positively deleterious to the child because of the father's misconduct and notoriety. Generally, minor embarrassment or emotional upset has been held not sufficient to require that a change of name be granted.

*Cohee v. Cohee*, 210 Neb. 855, 857–58, 317 N.W.2d 381, 383 (1982). *See also Spatz v. Spatz*, 199 Neb. 332, 258 N.W.2d 814 (1977) (court rejected mother's attempt to change three children's names from their father's name of Spatz to her name of Laflan). Recently, the Nebraska statute was challenged as unconstitutional because it prevented giving a child a surname at birth with which the child had no legally established parental connection. The Court of Appeals for the Eighth Circuit held the statute did not unconstitutionally infringe a parent's right. *Henne v. Wright*, 904 F.2d 1208 (8th Cir.1990), *cert. denied* 498 U.S. 1032, 111 S.Ct. 692, 112 L.Ed.2d 682 (1991).

In *Henne*, a mother sought to name her daughter McKenzie simply because she liked the name. Her daughter and two other children whom she had named McKenzie for the same reason had no connection with anyone by that name. In finding that there is no fundamental right of privacy under the Fourteenth Amendment protecting this desire the court said: "[W]e can find no American tradition to support the extension of the right of privacy to cover the right of a parent to give a child a surname with which that child has no legally recognized parental connection." *Id.* at 1215. One reason given by the circuit court for the legislation in Nebraska is that "[T]he legislature could reasonably perceive that in the absence of a law such as section 71–640.01, the name of a non-parent could be improperly appropriated to achieve a deliberately misleading purpose, such as the creation of a false implication of paternity." *Id.*

Courts have generally recognized that the father, who is ordinarily the objecting party, has a protectable interest in having his child bear the paternal surname in accordance with the usual custom, even though the mother may have been awarded custody of the child. A majority of courts have deemed that the noncustodial father's interest in having the minor child bear the

paternal surname is entitled to "significant consideration." *See* Annotation, *Rights and Remedies of Parents Inter Se with respect to the Names of Their Children*, 92 A.L.R.3d 1091 § 7 (1979). These courts have stressed that the father's desire to maintain a bond with the child is entitled to significant consideration. *Id.* at 1105–06.

In *In re Shipley*, 26 Misc.2d 204, 205 N.Y.S.2d 581 (1960), the court said that the possible adverse affect on the relationship between a natural father and his children is a valid ground of his objecting to a change in the children's surname where the father has evidenced a sustained interest in the children by continuing support payments and visitation and does not unreasonably delay in objecting to the change. In *Flowers v. Cain*, 218 Va. 234, 237 S.E.2d 111 (1977), the court observed that where a divorce occurs and the mother is awarded custody, usually it is in the child's best interests to maintain and encourage, rather than weaken, the relationship between the father and the child. Hence, a court is reluctant to change a child's name over the objection of a devoted father, for fear that the change would damage further the already strained father-child relationship.

In *In re Lone*, 134 N.J.Super. 213, 221, 338 A.2d 883, 887–88 (1975), the court said:

The realities are that the child's present name represents his identity, his paternity and a remaining bond with his father.... A change of name imposed on a child could represent to him a rejection by his father; or evidence that his father is deserving of rejection or contempt; or an attempt by his mother to deceive him as to his true identity.

Moreover, potential embarrassment, harassment, and the obscure possibility of confusion is not enough to change a child's name from its father's surname. *Robinson*, 302 Minn. at 37, 223 N.W.2d at 141.

In the case at bar, Rhonda has made no assertion that Ronald is an unfit father. Quite to the contrary, she and her mother testified in support of Ronald's successful attempt to obtain custody of his daughter, Jessica Gulsvig, born of a prior marriage. He has supported his children and given primary care to his daughter. He asserted

his right to visit his son from the date of his birth. There is no evidence of opprobrium that would make it inappropriate for his son to bear his name. In short, the record shows no fault by Ronald in any attribute that would weaken his right to have his child bear his name.

By contrast, applying the standards and reasons thought important by the majority of courts in the United States, Rhonda's claim shows no valid reason for rejecting the name of the child's father. Her claim to name the child a name of her own choosing is based on no more weighty factors than personal pique at Ronald and her conception of appearances. Before her divorce proceeding was commenced against Ronald she was going to register her daughter Amanda Acosta at school as Amanda Gulsvig. She testified that after her divorce from Ronald she would prefer her birth name "Even" for herself, surnaming Jamie "Acosta" because that was her daughter's surname. Rhonda has changed her name six times in the last six years. She says she will retain the name Acosta if she marries again in order to retain the appearance of a family unit. No indication is given whether subsequent children of Rhonda's would be named "Acosta," no matter who the father is, for the same reason she presents here. In this day of frequent divorce and multiple families, the importance of appearance is more myth than substance.

Rhonda allowed Ronald one visit from the date of their son's birth to the date of the divorce decree, a period of three and a half months. Her matriarchal attitude was fully displayed when she told Ronald she did not want him to have anything to do with her son.

The legal standard that should be applied in this case of determining the child's name at birth should be more stringent than what is applied by the majority of courts in applications to change a name. In name change cases involving minors, the noncustodial father's name is entitled to be given significant consideration and a change is not warranted unless there is clear and convincing evidence that it is in the child's best interests to change its name. Even by this standard, Rhonda's evidence in support of her actions is grossly inadequate to meet these requirements of proof.

No name change case has been cited and I have found none in the United States that has sanctioned the stripping of a father's name from his child when he is without fault and the placing of another man's name on the child with whom the child has no biological or legal relationship. I do not believe a divorced father, who is without fault, should have to face the distinct possibility of losing not only the custody of his children but of having his name forever excised from their being. To approve Rhonda's unilateral and deceitful act on the principle of promoting family unity is not an affirmation of the equality of women, which I support, but an assault on the dignity of man. The noncustodial father's role is reduced to that of an anonymous sperm donor, finance provider and unwelcome visitor. At once, history is ignored, custom rejected and geneology abjured.

I would reverse the trial court on this issue and remand with instructions to order a correction of the birth certificate to show the child's birth surname as Gulsvig, pursuant to the court's authority under chapter 598.