**IN THE COURT OF APPEALS OF IOWA**

No. 14-1882
Filed November 25, 2015

**FRED K. AGYEPONG-YEBOAH,**
　　　　Plaintiff-Appellant/Cross-Appellee,

**vs.**

**ANNA ROEDER,**
　　　　Defendant-Appellee/Cross-Appellant.
_____

　　　　Appeal from the Iowa District Court for Scott County, Mark R. Lawson,

Judge.


　　　　Fred Agyepong-Yeboah appeals, and Anna Roeder cross-appeals, the

district court's order placing physical care of a child with Anna. **AFFIRMED ON**

**APPEAL; AFFIRMED ON CROSS-APPEAL.**



　　　　Eric D. Puryear of Puryear Law, P.C., Davenport, for appellant.

　　　　Alicia D. Gieck of H.J. Dane Law Office, Davenport, for appellee.



　　　　Considered by Potterfield, P.J., and Doyle and Tabor, JJ.

**DOYLE, Judge.**

Fred Agyepong-Yeboah appeals the district court order setting joint legal custody and placing physical care of his child with Anna Roeder.  Anna cross-appeals the court's orders denying retroactive child support and setting "off-week" visitation with Fred.  Both parties challenge the district court's order with regard to the child's name.  Anna requests appellate attorney fees.

**I.**     ***Background Facts and Proceedings***

Fred and Anna are the parents of a child who was born in June 2012.  Fred and Anna were involved in a relationship that ended in July 2011.  During a brief period of reconciliation in September 2011, Anna became pregnant.

Anna was disappointed with Fred's reaction to the news of the pregnancy.  Fred was "shocked" and felt the pregnancy "was all a ploy to entrap [him]."  Fred thereafter tried unsuccessfully to reestablish communication with Anna.  Anna did not notify Fred of the child's birth.  Anna later stated she was too busy taking care of the child to notify Fred.  Fred learned of the child's birth on Facebook.

Fred, age thirty-eight at the time of trial, moved from Ghana to the United States in 1997.  He is an engineer for Transamerica in its IT department.  He works a two-week schedule with twelve-hour days: Sunday through Tuesday the first week, then Sunday through Wednesday the next week.  He earns approximately $75,000 per year.  Fred lives in a five-bedroom house in Cedar Rapids with his wife and her six- and nine-year-old sons.  Fred has an "excellent" relationship with his step-children.

Anna, age thirty-five at the time of trial, is a medical doctor licensed to practice in the Dominican Republic, but not in the United States.  Anna works as

an assistant visiting professor at St. Ambrose University in biology, anatomy, and physiology. She generally works days, and has weekends, summers, and holidays off, as well as school breaks. Anna earns approximately $48,000 per year. She resides in a two-bedroom home in Bettendorf, close to extended family including her sister and her parents.

In July 2012, Fred filed a petition for paternity, custody, visitation, and support. Trial began on June 5, 2013, but the case was not concluded and was continued to August 23, 2013.

Meanwhile, on June 25, 2013, the district court entered an order on temporary matters, as agreed to by the parties. The temporary order provided Fred and Anna would have joint legal custody of the child with physical care of the child with Anna. The order set forth a "phased-in visitation schedule" for Fred, beginning with supervised two-hour Saturday visits and culminating with "regular visitation" on alternating weekends from Friday at 7:45 a.m. until Sunday at 8:00 a.m. This was the first contact Fred had with the child.

The August 23, 2013 trial date was continued to January 2014. The continuance resulted in a flurry of motions by the parties, including a motion for expanded visitation filed by Fred and an application for temporary child support and attorney fees filed by Anna. A hearing on the parties' motions took place in October 2013. The court entered a modified temporary order, continuing Fred's alternating weekend visitation with the child, awarding Fred visitation over the Thanksgiving and Christmas holidays, and ordering Fred to pay temporary child support to Anna in the amount of $503.47 per month.

Trial was continued twice more, and ultimately took place over two days in April 2014. "In the interim," the court awarded Fred additional visitation, 4:00 p.m. to 8:00 p.m. every Thursday. The court denied Fred's second motion for expanded visitation filed in February 2014.

Fred and Anna testified at trial. The court also heard testimony from Fred's wife, Fred's mother-in-law, and Anna's mother. Anna described the child as "happy" and "advanced." She stated he "thrives" on schedules, routines, and "consistency." Anna testified the child was adjusted to the current visitation arrangement and was "excited" to see his father before visits. The child attended an in-home daycare while Anna was at work. He was enrolled in two-year-old preschool on Mondays and Wednesdays. Both Fred and Anna sought physical care of the child.

The court entered a paternity decree in May 2014, ordering the parties to share joint legal custody of the child, with Anna having physical care. The court awarded Fred visitation every other weekend from Thursday at 8:00 a.m. to Sunday at 6:00 p.m.,[1] and mid-week visitation from 4:00 p.m. to 7:00 p.m. on the off-week Thursday. The court also ordered Fred to have visitation on alternating holidays and four weeks in the summer.

The court ordered Fred to pay child support of $627.96 per month and provide health insurance coverage for the child through his employer. The court also ordered the child's name be changed from R. David Murphy Roeder (the

---

[1] The court ordered this arrangement remain in effect until the child "begins *four-year preschool*, at which time visitation shall be reduced to Friday at 6:00 p.m. to Sunday at 6:00 p.m."

name Anna gave to the child at birth) to R. Kwame Roeder to "reflect[] the cultural background of both parents."

Fred filed a motion to expand or enlarge; Anna filed a motion to amend or enlarge. Fred filed a notice of appeal; Anna filed a notice of cross-appeal. Fred and Anna also both filed motions for limited remand. In July 2014, the Iowa Supreme Court entered an order, treating the parties' notices of appeal as applications for interlocutory review. The court denied the applications and returned the case to the district court to allow the court to rule on the parties' post-ruling motions.

Following a hearing, the district court entered a ruling on the parties' cross-motions to amend or enlarge, denying the motions in substantial part. Fred appeals; Anna cross-appeals. Additional facts will be set forth as relevant to the issues presented.

## II.    *Standard of Review*

Issues ancillary to a determination of paternity are tried in equity. *See* Iowa Code § 600B.40 (2013). We review equitable actions de novo. Iowa R. App. P. 6.907. When we consider the credibility of witnesses in equitable actions, we give weight to the findings of the district court, but are not bound by them. *See* Iowa R. App. P. 6.904(3)(g).

## III.    *Physical Care*

Fred requests physical care of the child, or in the alternative, that the parties share care of the child. In determining physical care for a child, our governing consideration is the best interests of the child. Iowa R. App. P. 6.904(3)(o). Our analysis is the same whether the parents were married or

unwed. *See Lambert v. Everist*, 418 N.W.2d 40, 42 (Iowa 1998). Our objective is to place the child in an environment likely to promote a healthy physical, mental, and social maturity. *See In re Marriage of Hansen*, 733 N.W.2d 683, 695 (Iowa 2007).

When physical care is an issue in a paternity action, we apply the criteria found in Iowa Code section 598.41. Iowa Code § 600B.40. We also apply the factors found in *In re Marriage of Winter*, 223 N.W.2d 165, 166-67 (Iowa 1974). *See Lambert*, 418 N.W.2d at 42.

Fred claims "the majority of the factors" weigh in favor of ordering physical care of the child with him. Fred alternatively claims shared physical care is appropriate because he is "interested in co-parenting" with Anna, and the child would "benefit having more contact with his father." After carefully reviewing the evidence, however, we agree with the district court's ultimate resolution of this case.

We turn first to the question of shared care. In deciding whether to award joint physical care where there are two suitable parents, stability, continuity, and approximation of caregiving are important factors to consider. *See Hansen*, 733 N.W.2d at 696-97. We also consider the ability of the parents to communicate and show mutual respect, as well as the degree of conflict between the parents. *See id.* at 697-99. The district court found, "The parties are both excellent parents. [The child] is thriving under the current arrangement. He appears to be a well-adjusted child who is bonded to both his family in Davenport and his family in Cedar Rapids." But the court found that Fred and Anna had "engaged in a

power struggle over various issues," primarily caused by Fred's controlling behavior and Anna's immature responses to Fred's attempts to control.

Aside from the parties' difficulty communicating, the geographic distance between the parties mitigates against a shared care arrangement. Fred testified driving time for visitation took an hour and fifteen minutes each way. The child was enrolled in two-year-old preschool, and he would soon begin three-year-old preschool. And for the majority of the child's young life, Anna has been the primary caregiver. Based on the unique facts presented in this case, we agree with the district court that shared physical care is not in the best interest of the child.

We turn to Fred's contention that physical care of the child should be placed with him. "In making this decision, the factors of continuity, stability, and approximation are entitled to considerable weight." *See id.* at 700. Although Anna has been the child's primary caregiver, Fred states the child is "the perfect age to move without any difficulties," because he is "young enough that he has not lived with [Anna] for an extraordinary period of time, and he is old enough that he can move without any abandonment or attachment issues."

Fred states if the child were placed in his care, the child would "never" have to be in daycare or with his maternal grandparents because his wife or her mother could care for him while Fred was working from 7:00 a.m. to 7:00 p.m. On working days, Fred left the house at 6:45 a.m. and returned usually between 7:15-7:30 p.m. On those days, Fred acknowledged he would see the child forty-five minutes "max." The child attended daycare and preschool or was cared for

by his maternal grandparents while Anna worked from 8:00-8:30 a.m. to 3:30-4:00 p.m. Fred acknowledged the child was thriving under his current schedule.

It is abundantly clear Fred is an excellent father. Anna's testimony with regard to Fred's parenting ability was complimentary and she stated the child was bonded to his father; Anna supports Fred's relationship with the child. Indeed, Anna's support of Fred's relationship with the child is requisite to an award of physical care. *See id.* at 700. Anna's insight into the parties' power struggles, "including even routine decisions such as haircuts," weighs in her favor in determining physical care. The district court found:

> Anna should be granted primary physical care. Shared physical care is not appropriate in this case. Anna has historically been the primary caregiver for the child. Although Fred contends this is because Anna shut him out of [the child]'s early life, this was to some extent self-induced due to his ambivalence towards her pregnancy early on.
> . . . .
> Anna's work schedule is more flexible and better suited to childcare. This physical care arrangement will not disrupt the child's preschool. The Court also notes the demanding and controlling nature of Fred's relationship with Anna and finds this is a factor weighing against an award of primary physical care to him.

Fred claimed the court placed too much weight on the parties' "power struggle."

In its ruling on post-trial motions, the court further found:

> The Court notes that Fred's demeanor was more intense and less relaxed on the second day of trial. As noted in the decree, Fred has been demanding with respect to his expectations regarding communication. He has engaged in a power struggle with Anna over issues such as the child's haircut. Whether these actions are due to his personality, or a feeling that he has been "shut out" of the child's life, he does not appear to have insight into the power struggle issues. The Court concludes that Anna has more insight as to these issues.

Based on the unique facts presented in this case, we agree with the district court that placing physical care with Anna is in the best interest of the child. We therefore affirm on this issue.

## IV. The Child's Name

Fred appeals, and Anna cross-appeals, the district court's order with regard to the child's name. Fred claims the child's name "should have been changed to reflect the child's paternity." According to Fred, the district court correctly changed the child's middle name from "David Murphy" to "Kwame," but the court erred in failing to change the child's last name from "Roeder" to "Agyepong-Yeboah" or, in the alternative, "Roeder-Yeboah." Anna claims the court erred in changing the child's middle name from "David Murphy" to "Kwame."

"[W]hen the court first entertains an action between the parents to determine their legal rights and relationships with each other and the child, the court may also consider the legitimacy of the child's original naming as part of its determination of the child's legal status and custody." *Montgomery v. Wells*, 708 N.W.2d 704, 706 (Iowa Ct. App. 2005). The court has authority to enter a ruling on a child's legal status, "including the determination of a child's surname." *See id.* at 707. "[N]either parent has a superior right in determining the child's last name. Moreover, our Supreme Court has specifically rejected the historical tradition of using a father's surname for a child." *Id.* at 707-08 (citing *In re Marriage of Gulsvig*, 498 N.W.2d 725, 729 (Iowa 1993)).

The child recognizes his last name as Roeder and he is primarily physically present in Anna's home, who shares that last name. Fred expressed

the importance of having his family heritage recognized through the child's name. We believe Fred's heritage should be represented by the child's name. In the paternity decree, the district court ordered the child's name be changed from R. David Murphy Roeder to R. Kwame Roeder to "reflect[] the cultural background of both parents."

Although Fred requests the child's last name be changed to Agyepong-Yeboah or Roeder-Yeboah,[2] in this unique case, we reject that solution. *See Gulsvig*, 498 N.W.2d at 729 ("The parties each testified that a hyphenated name was considered; however, the trial court did not address this solution. In recent years courts have recognized that a hyphenated name of both parents' surnames may best serve the interest of a child. We believe that selecting a hyphenated name in this case would pour salt in the wounds of one or both of the parties and eventually would affect James. We reject this solution."). We, as did the district court, conclude that the child's best interest will be served by retaining the surname Roeder. We affirm the district court's order changing the child's name to R. Kwame Roeder.

## V. *Retroactive Child Support*

Anna challenges the district court's decision not to award retroactive child support. Anna asks the court to order Fred to pay retroactive child support of $14,644.20, representing his support obligation effective November 2014, reduced by the amount of temporary support he paid between November 2013

---

[2] Fred did not present his request for the child's last name of "Roeder-Yeboah" before the district court. Although Fred's last name is "Agyepong-Yeboah," Fred testified he did not use his full hyphenated name in day-to-day living, referring to his last name only as "Yeboah," as did his wife. Given the parties' history and the facts of this case, we believe the last name "Roeder-Yeboah" for the child is ill-advised.

and November 2014. Anna raised this issue before the district court, and the court denied her request.

Iowa Code section 600B.25(1) provides that in paternity proceedings, a court may order the father to pay an amount for past support and maintenance of a child. The Iowa Supreme Court has stated:

> Unlike a current child support obligation, the guidelines are not used to establish the amount of past child support. Instead, our legislature permits the court to order a parent to pay an amount "the court deems appropriate for the past support and maintenance of the child." Iowa Code § 600B.25(1). This standard permits the court to consider all the surrounding facts and circumstances to determine the amount in light of the purpose of child support and the duty of a parent to pay child support.

*Markey v. Carney*, 705 N.W.2d 13, 24 (Iowa 2005).

In this case, the court was not obligated to award any past child support to Anna. The court considered the facts surrounding the child's birth (including the fact that Anna did not tell Fred about the child's birth and Fred found out about the child's birth on Facebook) and its finding that "Anna was not eager to see Fred establish a relationship with the child." The court concluded:

> Anna requests that Fred's child support obligation be made retroactive. Fred resists. The Court declines to order Fred to pay retroactive child support due to Anna's reluctance to involve Fred in the child's life and her failure to notify him of the child's birth. Under these circumstances, the Court concludes that retroactive child support would be inequitable.

The disposition reached by the district court was proper and equitable under these circumstances. We affirm on this issue.

## VI.     *"Off-Week" Visitation*

Anna requests the court eliminate Fred's mid-week visit with the child from 4:00 to 7:00 p.m. on the Thursdays of the weeks Fred does not have a weekend

visitation. Pursuant to the temporary order, Fred received mid-week visitation with the child on Thursdays from 4:00 to 8:00 p.m. in the Quad Cities area. At trial, Anna requested Fred "continue . . . to have . . . his mid-week visit. Thursdays seem to be working for him, so to continue that." On appeal, Anna states her "proposal was conditioned upon facts as they existed at the time of trial, specifically that Fred's off-week Thursday visits would continue to occur in the Quad City area," rather than in Cedar Rapids. According to Anna, "[g]iven the distance between the parties, Fred's off-week visitation is simply unfair to [the child]."

When establishing visitation rights, our guiding light remains the child's best interests. *See In re Marriage of Stepp*, 485 N.W.2d 846, 849 (Iowa Ct. App. 1992). Generally, liberal visitation serves the child's best interests. *Id.* Although section 598.41(1)(a) directs courts to reach a custody determination with liberal visitation that "will assure the child the opportunity for the maximum continuing physical and emotional contact with both parents," that directive is in the context of what "is reasonable and in the best interest of the child."

The provision Anna challenges concerns Fred's Thursday off-week visit— which is now one hour shorter than it was under the temporary order. Given the distance between the parties (one hour and fifteen minutes), assuming Anna picks up the child from the visit at 7:00, the child is back to Anna's home by 8:15—fifteen minutes later than his prior Thursday visits. Considering Anna's *request* at trial to continue the parties' previous Thursday visitation schedule, we find her contention on appeal to be unpersuasive. Moreover, allowing the visitation to occur in Cedar Rapids enables the child to see his step-mother and

step-siblings on the weeks he does not have weekend visitation with Fred. Because we believe the visitation schedule entered by the court to be in the child's best interest, we affirm on this issue.

### VII. Appellate Attorney Fees

Anna seeks $5000 in attorney fees for this appeal. In paternity actions, "[t]he court may award the prevailing party the reasonable costs of suit, including but not limited to reasonable attorney fees." Iowa Code § 600B.25(1). "An award of appellate attorney fees is within the discretion of the appellate court." *Markey*, 705 N.W.2d at 26. "Factors to be considered in determining whether to award attorney fees include: the needs of the party seeking the award, the ability of the other party to pay, and the relative merits of the appeal." *In re Marriage of Okland*, 699 N.W.2d 260, 270 (Iowa 2005) (quotation marks omitted). We decline to award any appellate attorney fees to Anna. Each party shall be responsible for their own costs on appeal.

We affirm the decision of the district court.

**AFFIRMED ON APPEAL; AFFIRMED ON CROSS-APPEAL.**