# IN THE COURT OF APPEALS OF IOWA

No. 17-0823
Filed November 8, 2017

**MATTHEW MOSES,**
 Plaintiff-Appellee,

**vs.**

**ANGELA WHITE,**
 Defendant-Appellant.
_____

 Appeal from the Iowa District Court for Linn County, Sean W. McPartland, Judge.


 A mother appeals following a custody decree and surname determination in favor of the father. **AFFIRMED.**



 Peter W. Stiefel, Victor, for appellant.

 Joseph C. Pavelich of Spies Pavelich & Foley, Iowa City, for appellee.



 Considered by Vogel, P.J., and Potterfield and Mullins, JJ.

**MULLINS, Judge.**

Angela White appeals from a custody and surname determination in favor of Matthew Moses. Angela contends the district court erred in failing to grant her physical care of the child and consider the child's relationship to his half-siblings. She also argues the court erred in determining the child's surname.

## I. Background Facts and Proceedings

Angela and Matthew were in a relationship between November 2013 and January 2014. Their relationship resulted in a child, L.D.W. Angela is also the primary caretaker for her two older children. Although Angela suspected she was pregnant in December 2013, and discussed the possibility with Matthew, pregnancy tests were negative. In February 2014, tests confirmed Angela's pregnancy.[1] Although Angela attempted numerous times to re-establish communication with Matthew, he was resistant to communication and to a relationship with the child.

During the course of her pregnancy and following L.D.W.'s birth, Angela changed residences three times. At times, Angela would not tell Matthew where she and the child were living. Angela has a varied employment and educational history, studying both culinary arts and "police science," and holding security and factory positions for different companies. At the time of trial, however, she was neither taking classes nor employed.

Matthew's residence and employment remained the same throughout the course of proceedings. Matthew married in the summer of 2015. His wife,

---

[1] Matthew alleges he was suspicious of the results of the pregnancy tests due to prior indications Angela was not pregnant. He also doubted his paternity based on L.D.W.'s due date.

Mollie, works as a paraprofessional and nanny and helps care for L.D.W. when Matthew has care of the child.

Following L.D.W.'s birth and the confirmation of Matthew's paternity, Matthew expressed a desire to become involved in the child's life. Angela resisted. Angela did not allow Matthew to see L.D.W. until visitation was ordered by the court. There is also a history of tension between Angela and Mollie, culminating in an incident in which Angela confronted Mollie, screaming and yelling in the child's presence. During a custody transfer, Angela left her car and approached Mollie, who was sitting in Matthew's car with the door and window closed. Angela insisted Mollie get out of the car to discuss insults and judgmental statements Mollie allegedly made about Angela's parenting. Mollie and Matthew testified that Angela screamed and yelled for Mollie to get out of the car, which Mollie refused. Angela conceded she created the incident and the child likely understood the stress of the situation.

The parties agreed to joint legal custody but disputed who should have physical care of the child. After a hearing, the district court awarded physical care to Matthew and determined L.D.W. should carry Matthew's surname.

Angela appeals.

## II. Standard of Review

Child custody and surname disputes are reviewed de novo. *In re Marriage of Hansen*, 733 N.W.2d 683, 690 (Iowa 2007); *Montgomery v. Wells*, 708 N.W.2d 704, 705–06 (Iowa Ct. App. 2005). Weight is given to the findings and credibility determinations of the district court. *Hansen*, 733 N.W.2d at 690.

The best interests of children are a primary consideration. *In re Marriage of Ford*, 563 N.W.2d 629, 631 (Iowa 1997).

### III. Custody Determination

Angela contests the district court's award of physical care to Matthew.[2] The district court found either parent could be a suitable physical care provider, forcing it to decide which parent could "minister more effectively to the [child]'s well-being." *In re Marriage of Federici*, 338 N.W.2d 156, 158 (Iowa 1983). We give weight to the district court's credibility determinations because of its ability to observe witnesses testifying in person. *In re Marriage of Vrban*, 359 N.W.2d 420, 423 (Iowa 1984). In making custody determinations, courts consider, among other things, the factors described in Iowa Code section 598.41(3) (2015).[3] *See Ford*, 563 N.W.2d at 631. Courts consider the same factors if the

---

[2] Angela concedes Matthew lives in an area with appropriate schools, is bonded to L.D.W., and also has an appropriate home environment for the child. Because of her concessions, these factors will not be discussed further.

[3] These factors include but are not limited to:

a. Whether each parent would be a suitable custodian for the child.

b. Whether the psychological and emotional needs and development of the child will suffer due to lack of active contact with and attention from both parents.

c. Whether the parents can communicate with each other regarding the child's needs.

d. Whether both parents have actively cared for the child before and since the separation.

e. Whether each parent can support the other parent's relationship with the child.

f. Whether the custody arrangement is in accord with the child's wishes or whether the child has strong opposition, taking into consideration the child's age and maturity.

g. Whether one or both of the parents agree or are opposed to joint custody.

h. The geographic proximity of the parents.

i. Whether the safety of the child, other children, or the other parent will be jeopardized by the awarding of joint custody or by unsupervised or unrestricted visitation.

custody dispute arises from a dissolution or from unwed parents. *Heyer v. Peterson*, 307 N.W.2d 1, 7 (Iowa 1981).

Angela's arguments center on her history of providing physical care to the child, the child's well-being, and the child's relationship to his half-siblings.[4] She alleges, because the child is "thriving," "progressing normally," and is "smart, healthy, and happy," it is unlikely that a change in physical care to Matthew would benefit the child.

Matthew argues Angela's refusal to allow him to see the child prior to a court order allowing visitation, her employment and housing instability, and her inappropriate communication with Mollie justify the court placing the child in his physical care.

Angela correctly argues the interest in keeping siblings together also applies to half-siblings. Angela relies on *In re Marriage of Orte*, in which the closeness of a child and older half-sibling, who were separated in age by four years, was a factor that permitted the children to remain together where there were no other factors sufficient to require separating the children. 389 N.W.2d 373, 374–75 (Iowa 1986). The *Orte* court noted, "Everyone agreed that these young boys were very close." *Id.* at 374.

The record is not so clear here. L.D.W.'s older siblings are separated by six and nine years of age. All three children have lived together for L.D.W.'s

Iowa Code § 598.41(3)(a)-(i).

[4] Matthew alleges Angela failed to preserve error on her argument that a child's relationship to half-siblings should be a controlling factor in best-interests determinations, but he agrees error has been preserved on the other factors. Because the ultimate issue, child custody, was decided by the district court, we elect to bypass Matthew's error-preservation claim and proceed to the merits. *See, e.g.*, *State v. Taylor*, 596 N.W.2d 55, 56 (Iowa 1999) (bypassing an error-preservation issue and proceeding to the merits of the appeal).

entire life, and Angela testified that the children are "almost inseparable." But Matthew testified that, when Angela has custody of L.D.W., the half-siblings are in the care of one of their respective fathers, meaning the care schedules do not always overlap. Relying on the record and credibility determinations of the district court, we find there is no indication that the relationship between L.D.W. and his half-siblings is so closely bonded to compel a custody determination for Angela.

The record shows Angela has provided adequate care and an appropriate environment for L.D.W. While this history is an important factor, it is not dispositive. *See Hansen*, 733 N.W.2d at 697. The record also displays Angela's instability in housing and employment, and her voluntary unemployment and removal from school at the time of trial. Angela has shown past difficulty engaging in constructive communication with Matthew and Mollie. *See id.* at 701 (finding that communication problems may lead to disruption in the lives of children). Angela conceded her role in creating "drama" between the parties, which the district court found was contrary to the best interests of L.D.W. We are also mindful of Angela's contribution to Matthew's absence in L.D.W.'s early life by refusing to allow visits prior to a court order. Furthermore, Angela has a history of refusing Matthew's requests for additional time with the child.

This is not to say Matthew has been a perfect father. He has at times also engaged in "drama," refused to support Angela throughout her pregnancy, and failed to engage with L.D.W. prior to paternity testing. We do, however, agree with the district court that Matthew accepted and embraced his role as L.D.W.'s father once paternity was confirmed. He has taken appropriate measures to

engage in the child's life and has the support necessary to provide for the child's well-being. Matthew and Mollie both have a history of consistent employment and are able to provide a stable home. The court's credibility findings in favor of Matthew are also substantial. *See Ford*, 563 N.W.2d at 633–34 (finding deference to district court credibility determinations combined with factual evidence to support an award of physical care).

Because we agree with the factual findings of the court, which are supported by credibility determinations, we agree Angela has failed to show she is better equipped to provide physical care for L.D.W. Matthew's employment and home stability, support system, and encouragement of continued contact with Angela and the half-siblings give him a greater ability to provide for the child's well-being.

## IV. Surname Determination

Both parties agree the surname dispute arises from an initial name determination. L.D.W.'s name was chosen unilaterally by Angela shortly after the child's birth. Angela argues a physical care determination in her favor, the fact that White is the only surname the child has known, and Matthew's failure to engage at the time of the child's birth all weigh in favor of the child's last name remaining White. Matthew argues the district court correctly determined the child's last name due to its physical-care determination and L.D.W's bond with the Moses family, and generally relies on the factors listed in *Montgomery v. Wells*. *See* 708 N.W.2d at 708–09. Matthew also argues there would be no impact on any bond between L.D.W and his half-siblings.

A surname determination involves weighing factors on a case-by-case basis. *Id.* A mother "does not have the absolute right to name the child because of custody due to birth." *In re Marriage of Gulsvig*, 498 N.W.2d 725, 729 (Iowa 1993). The historical tradition of using a father's surname has also been rejected. *Montgomery*, 708 N.W.2d at 708.

The district court described this as a "close case," but it relied on the *Montgomery* factors to find that carrying Matthew's surname would be in L.D.W's best interests. *Id.* at 708–09.[5] The district court specifically discussed the child's youth as detracting from his familiarity with his surname, that Matthew had taken "full parental responsibility," the fact that Angela's other children do not share the same surname, that Angela's surname could change if she marries, and the award of physical care to Matthew.

---

[5] The *Montgomery* factors are:

1. Convenience for the child to have the same name as or a different name from the custodial parent.
2. Identification of the child as a part of a family unit.
3. Assurances by the mother that she would not change her name if she married or remarried if the child maintains the mother's surname.
4. Avoiding embarrassment, inconvenience, or confusion for the custodial parent or the child.
5. The length of time the surname has been used.
6. Parental misconduct, such as support or nonsupport or maintaining or failing to maintain contact with the child.
7. The degree of community respect associated with the present or changed name.
8. A positive or adverse effect a name change may have on the bond between the child and either parent or the parents' families.
9. Any delay in requesting or objecting to name change.
10. The preference of the child if the child is of sufficient maturity to express a meaningful preference.
11. Motivation of the parent seeking the change as an attempt to alienate the child from the other parent.
12. And any other factor relevant to the child's best interest.

*Montgomery*, 708 N.W.2d 708–09.

On our de novo review, we agree with the conclusions of the district court. L.D.W. does not share the surname of his half-siblings. It is doubtful that embarrassment, inconvenience, or confusion would result from changing his surname to that of his father. The record shows that both parents intend to remain involved throughout L.D.W.'s life, and it is unlikely the surname determination would change that. Finally, L.D.W. is now three years old, rendering surname familiarity insubstantial. Weighing these factors, the credibility findings of the district court, and considering L.D.W.'s best interests, we affirm the district court's determination that the child should carry Matthew's surname: Moses.

**AFFIRMED.**