# IN THE COURT OF APPEALS OF IOWA

No. 18-0729
Filed January 9, 2019

IN RE THE MARRIAGE OF HEATHER ANN ROCKWELL
AND NATHAN LEE ROCKWELL

Upon the Petition of
HEATHER ANN ROCKWELL,
        Petitioner-Appellee,

And Concerning
NATHAN LEE ROCKWELL,
        Respondent-Appellant.
_____

        Appeal from the Iowa District Court for Cerro Gordo County, Christopher C.

Foy, Judge.


        Nathan Rockwell appeals a decree dissolving his marriage to Heather

Rockwell. **AFFIRMED.**


        Judith O'Donohoe of Elwood, O'Donohoe, Braun, White, LLP, Charles City,

for appellant.

        Kristy B. Arzberger of Arzberger Law Office, Mason City, for appellee.


        Considered by Doyle, P.J., and Mullins and McDonald, JJ.

**MULLINS, Judge.**

Nathan Rockwell appeals a decree dissolving his marriage to Heather Rockwell. He argues the district court erred in: (1) including part of a business in the marital estate, (2) declining to include alleged liabilities in the marital estate, (3) deciding the physical care issue before hearing all of the evidence, (4) misjudging the credibility of the parties and failing to consider Heather's alienating conduct in reaching its physical care determination, (5) crafting the visitation schedule, and (6) declining to reopen the record after trial. Heather requests an award of appellate attorney fees.

## I.      Background Facts and Proceedings

Affording great deference to the district court's factual findings and thorough credibility determinations[1] in our de novo review of this equitable proceeding, we make the following factual findings.

---

[1] The district court provided the following credibility findings:
> The Court harbors no illusions that either party was totally truthful on the witness stand. It found Heather to be less than forthcoming in certain aspects of her testimony, particularly when describing what she perceived as character flaws or bad behavior on the part of Nathan or responding to unfavorable evidence regarding situations or events that might reflect negatively on her fitness as a parent. The Court likens her shading of the truth to the puffery that a salesperson might use when selling a used car and adjusted the weight that it gave to the testimony of Heather accordingly.
>       The disregard for the truth shown by Nathan in his testimony rivals the most blatant and extreme that the Court has ever observed. . . .
>       . . . .
>       The efforts undertaken by Nathan to deceive the Court regarding his ownership of Sure Service and the existence of bogus debts entirely destroyed his credibility. In preparing its decree, the Court gave no weight to the testimony of Nathan regarding any of the financial matters in dispute between the parties and very little weight to his testimony in matters pertaining to the children.

The parties married in 2008. The marriage produced two children, born in 2009 and 2011. At the time of trial, Heather was thirty-nine years of age and Nathan was forty-one. Prior to and early in the marriage, Heather worked for a cell phone company. Nathan did not like Heather working nights and weekends, so he recommended that she become a stay-at-home mom. Heather did so in 2010. She continued to be a stay-at-home mom until September 2016, after the parties' separation, when she obtained a position as a merchandiser for a beverage distributor earning twelve dollars per hour and working between twenty-five and thirty hours per week. She continued to hold this position at the time of trial. She has a flexible work schedule and is allowed to set her own hours, thus providing her the ability to work around the children's schedules. Nathan conceded in his testimony Heather is a good mother and loves the children. It is undisputed that Heather has been the historical caregiver for the children, while Nathan assumed a more traditional role of providing for the family financially.

One of the major issues in this appeal is whether Nathan owns Sure Service, the heating, air conditioning, and refrigeration business he works for. He holds himself out as the owner of the business; he maintains business cards that designate him as the owner; he claims the income of the business on his tax returns and listed himself as the proprietor of the business on his returns for tax years 2005 through 2015; and his name is on the company's billings. He also writes off a number of his personal expenses as expenses for the business. Nathan's work schedule is more demanding than Heather's. He leaves for work at 7:00 a.m. and sometimes does not get home until 10:00 p.m. He is always on call to respond to emergency service requests.

The parties separated in April 2016. The parties differed substantially in characterizing the circumstances surrounding the parties' separation. Heather alleged numerous instances of threatening, aggressive, and controlling behavior toward Heather and the children by Nathan; and Nathan implied infidelity and alcohol and drug problems on the part of Heather. Both parties' testimony supports a conclusion the tension in the marital home was on the rise before the parties separated.

According to Heather's testimony, the separation was a result of her older daughter's report to Heather that she was scared of Nathan because Nathan made a threatening statement to her. Upon this report, Heather left the marital home with the children and drove to the sheriff's department. Nathan's position is that there was no threatening statement on the day in question, and Heather essentially just left with the children. Heather filed a petition for relief from domestic abuse upon the recommendation of law enforcement, alleging past abuse and threatening behavior on the part of Nathan and noting the children were afraid of him. The petition was ultimately denied.

Heather filed her petition for dissolution of marriage in May. A temporary matters order was entered in June, placing the children in the shared physical care of the parties, with each parent to have the children in their care every other week. The order also required that "[i]f a party is unable to supervise the children for a period exceeding four hours, the other parent shall be given first priority of providing child care." On many occasions, Heather communicated her desire to care for the children while Nathan is at work. Instead of granting these requests, Nathan would have others care for the children while he worked. Nathan's mother,

Mary, would often care for the children during Nathan's parenting time. The children regularly spent the night with Mary when they were supposed to be with Nathan. Nathan largely neglected to take the children to their activities or medical and counseling appointments during his visitation time throughout the pendency of the proceedings.

There is evidence in the record, whether credible or not, that since the inception of these proceedings, both parties have made efforts to alienate the other from the children—Heather potentially coaching the children to make statements reflecting their preference of Heather as a custodial parent; and Nathan continuing to engage in aggressive behavior toward Heather and the children, limiting Heather's contact with the children while they are in his care, continuously fueling his apparent rage for Heather, and refusing to meaningfully communicate with her about the children's welfare. In response to a question by his attorney on direct examination, apparently in support of his request for shared physical care, Nathan confirmed "all the hard feelings and resentment [were] gone," and the parties were able to effectively communicate with one another about the children. We reject this factual assertion. The record is clear that Nathan harbors nothing but hatred and disdain for Heather, is unwilling to communicate with her about the children, and is ill-equipped to support Heather's relationship with the children. Although there is some evidence—again, whether credible or not—that Heather may have coached the children into saying negative things about Nathan to better her position on the question of physical care, what is clear is that Heather has been more than willing to initiate communication with Nathan relative to co-parenting the children, she wants Nathan to be involved in the children's lives, and she has gone

out of her way to make sure Nathan has every opportunity to do so. Heather tries to limit her communications with Nathan about the children to text messages, as Nathan is verbally abusive and calls Heather horrendous things when contact is made over the phone. A small sample of the parties' communications over the phone was admitted as evidence at trial. An audio recording of an October 2016 telephone call between the parties is quite telling of Nathan's motivations during these proceedings—Nathan stated he likes arguing with Heather and hates her, noted he does not care about his time with the children, indicated he does not care about having visitation time with the children, and advised Heather she could have the kids if she just "signed the papers." This indicates to us that Nathan cared more about settling the financial matters involved in these proceedings than he did about securing time with his children. In this phone call, Heather responded, "It would be nice if you could be actively involved in their lives."

The children are involved in various activities. Heather signs them up, pays for, and attends the activities. Heather also schedules and attends the children's medical and dental appointments. Nathan has attended one such appointment at most since the children were born. Heather is heavily involved with the children's schooling. Nathan is not.

The matter was submitted to the court following a four-day trial held in February and May 2017. In December, Nathan filed a motion to reopen the record, citing newly discovered evidence from the children's new counselor. Nathan filed a second motion on the same grounds in February 2018. The court entered its decree in March, and, among other things, denied Nathan's motions to reopen, granted the parties joint legal custody of the children, found a shared physical care

arrangement would be unworkable and awarded Heather physical care of the children, set a visitation schedule for Nathan, and divided the parties' assets. The court denied the parties' competing post-trial motions to reconsider, enlarge, or amend pursuant to Iowa Rule of Civil Procedure 1.904(2). As noted, Nathan appeals.

## II. Standard of Review

Review of dissolution cases is de novo. Iowa R. App. 6.907; *In re Marriage of Larsen*, 912 N.W.2d 444, 448 (Iowa 2018). As noted, while we give weight to the factual findings of the district court, especially when considering the credibility of witnesses, we are not bound by them. Iowa R. App. P. 6.904(3)(g); *In re Marriage of Fennelly*, 737 N.W.2d 97, 100 (Iowa 2007). Because the court bases its decision on the unique facts of each case, precedent is of little value. *In re Marriage of Brown*, 776 N.W.2d 644, 647 (Iowa 2009).

## III. Property Distribution

### A. Business as Part of Marital Estate

Nathan's first contention on appeal is that the district court erred in concluding Nathan is the owner of Sure Service and therefore including part of the business in the marital estate. Aside from only citing to a number of non-binding and inapplicable authorities, Nathan seems to argue the court's determination was unsupported by the evidence presented. Upon our de novo review of the record as summarized above, and affording deference to the factual findings and credibility determinations of the district court, we agree with the district court's finding that Nathan is the owner of the company.

Nathan also complains the court made no "attempt to arrive at a realistic value for Sure Service." In its decree, the court fully acknowledged there was insufficient information in the record to ascertain the value of the business on the date of the marriage, but proceeded to do so upon the evidence presented. Both parties presented evidence concerning the value of the business's assets, but no evidence was produced concerning the business's liabilities, assuming any existed. Having concluded Nathan owns the business, the court was required to divide it. *See* Iowa Code § 598.21(1) (2016). The court did so upon the evidence presented, and set aside half of the value of the business for Nathan as premarital. *See id.* § 598.21(5)(b). Nathan knew his ownership of Sure Service was a disputed issue and he could have presented evidence concerning the business's liabilities, if any, but he did not do so. Having reviewed the evidence presented, we find the court's valuation of the business was within the range of evidence—and actually fell on the lower end of the permissible range—and therefore do not disturb it. *See In re Marriage of Keener*, 728 N.W.2d 188, 194 (Iowa 2007).

Next, Nathan seems to argue that profits he received from Sure Service were gifts from his parents and therefore excludable as marital property. Ignoring that such an argument would require that the business be owned by his parents and that such an argument was not raised below, we reject the argument upon Nathan's acknowledgement that "There is no information in the record that show[s] that a specific gift was made . . . to Nathan." Regardless of who owned the business, the profits Nathan received could not be considered a "gift from his parents." It is undisputed Nathan worked for the business. Any profits he received amounted to compensation, not gifts.

B.    Nathan's Alleged Liabilities

Next, Nathan argues the court erred in declining to include alleged liabilities in the marital estate. As to the supposed liabilities, he maintains "there is credible evidence to support his assertion" these liabilities exist. However, as the district court noted, the evidence presented at trial renders Nathan's liability-related assertions wholly non-credible. For example, in response to interrogatories, Nathan reported that as of October 2016, he owed $65,000 to Custom Concrete, which is owned by his brother Mike Reindl; $205,000 to Brock Specialties, which is owned by his close friend Adam Brock; $25,000 to Orton Landscaping, which is owned by another close friend Mark Orton, $7500 to another close friend Rodney Helps; and approximately $400,000 to his mother. Then, in his affidavit of financial status filed shortly before trial, Nathan listed a "loan from mother" in the amount of $500,000 as his only debt. Then, at trial mere weeks later, Nathan alleged he owed $10,700 to Floyd and Leonard Auto Electric, $290,000 to Brock Specialties, $101,810 to Custom Concrete, $33,050 to Orton Landscaping, and "[p]robably couple hundred thousand" to his mom. He later testified on cross-examination, "Well, I think that I got most of that debt paid off with [mom] . . . but I'm not 100 percent sure." Later, he testified he has only paid his mother about $40,000 on the debt. Even later, he stated he does not know how much he owes his mother.

Nathan also submitted an invoice from another of his friends, a plumber named Cole Davison, in the amount of $14,020, apparently to apprise the court of yet another debt. But he admitted on cross-examination that he only paid around $2000 for those services because he did most of the work himself, and that amount was already paid off. Davison testified at trial and agreed Nathan promptly paid

him for his services in full roughly a year before trial in the amount of just under $2000. Davison also testified Nathan requested him to create a fake invoice for services for use as evidence at trial. Davison initially declined, knowing it was wrong, but after continued pressure by Nathan, he provided Nathan with the "fake" invoice in the amount of $14,020. Helps also testified Nathan does not owe him any money.

Nathan's mother and the proprietors of Brock Specialties and Custom Concrete were subpoenaed to provide documentation concerning the debts and to appear at trial to testify; none of them provided any documentation. Only Nathan's brother appeared to testify at trial, and his testimony was not believable. Finally, and perhaps most troubling, Nathan knowingly excluded cash in the amount of $448,964 from the affidavit of financial status he presented to the court prior to trial.

We find the court's conclusion that Nathan owns Sure Service and the valuation of the same to be supported by the evidence. We agree with the district court's conclusion that Nathan presented no credible evidence to prove the validity of his alleged debts. Having considered the issues raised, we affirm the district court's property distribution.

## IV. Physical Care and Visitation

### A. Consideration of Evidence

First, Nathan argues the district court abused its discretion by improperly deciding the physical care issue after the first day of the four-day trial in this matter. Nathan implies the court advised the parties after the first day of trial that it decided the issue upon the close of evidence that day, but notes "the operative discussion

was held in the chambers off the record." His claim is belied by the fact the parties continued presenting evidence relevant to the custody determination for the remainder of the four-day trial. In addition, on the third day of trial, during redirect examination of Nathan, Heather's counsel objected to discussion of certain matters that were obviously aimed at the physical care issue. The court overruled the objection, stating, "Generally, in custody cases we try to hear as much as we can from the parties." The court also overruled an objection to a custody-related exhibit on the ground that the exhibit was being offered for rebuttal purposes on the issue of custody. Nathan also complains the court refused to consider "new information presented, including the [Department of Human Services'] report." We find the complaint meritless, as the district court considered testimony concerning the subject report and admitted the report itself into evidence. Although the court did not specifically reference the DHS report in the decree, such does not mean it did not consider it in making its determination. *See In re Marriage of Thompson*, No. 17-0481, 2017 WL 6026727, at *4 (Iowa Ct. App. Nov. 22, 2017). Finally, no record of the supposed chambers discussion was made at the time of trial; we therefore must reject the challenge. *See In re F.W.S.*, 698 N.W.2d 134, 135 (Iowa 2005).

The record does not support Nathan's claim the court reached its decision on physical care after only the first day of trial. We therefore reject Nathan's challenge.

B.     Physical Care

Nathan seems to argue the court erroneously misjudged the credibility of the parties and mistakenly viewed Heather's testimony as truthful. At the same time, he points to passages in the court's decree which affirmatively indicate the

court had reservations about the credibility of some aspects of Heather's testimony. In any event, Nathan cites no legal authority to support his argument. As such, we deem the argument waived. *See, e.g.*, Iowa R. App. P. 6.903(2)(g)(3) ("Failure to cite authority in support of an issue may be deemed waiver of that issue."); *Hyler v. Garner*, 548 N.W.2d 864, 876 (Iowa 1996) ("In a case of this complexity, we will not speculate on the arguments [a party] might have made and then search for legal authority . . . to support such arguments."); *Inghram v. Dairyland Mut. Ins. Co.*, 215 N.W.2d 239, 240 (Iowa 1974) ("To reach the merits of this case would require us to assume a partisan role and undertake the appellant's research and advocacy. This role is one we refuse to assume.").

Nathan also suggests "the trial court underestimate[d] the ongoing efforts by Heather to alienate the children from" Nathan. We agree with Nathan that the court was required to consider such matters, *see* Iowa Code § 598.41(1)(c), but we disagree with him that the court failed to honor the requirement. The court noted its "concerns about awarding either party physical care," and specifically highlighted its "reservations about making Heather the custodial parent," noting, among other things, it was "troubled by the dismissive attitude displayed by Heather towards Nathan and the role he plays in the lives of their daughters" and "Heather has not properly supported and encouraged the relationship between Nathan and the children." Nathan fared no better, however, and weighing the pertinent factors, the court concluded a shared physical care arrangement would be unworkable and the children's best interests would be served by being placed in Heather's physical care. We reject Nathan's argument that the court failed to recognize or consider Heather's alienating conduct.

C.      Visitation

"A noncustodial parent should be awarded liberal visitation in order to afford the children the opportunity to maximize continuing physical and emotional contact with both parents." *In re Marriage of Farrell*, 481 N.W.2d 528, 531 (Iowa Ct. App. 1991). "Although liberal visitation is the benchmark, our governing consideration in defining visitation rights is the best interests of the children, not those of the parent seeking visitation." *In re Marriage of Brainard*, 523 N.W.2d 611, 615 (Iowa Ct. App. 1994). The district court awarded Nathan regular and liberal visitation with the children: every Tuesday evening, every other weekend, four weeks during the summer, one half of winter break, and alternating spring breaks and holidays. On appeal, Nathan argues he "should be granted more liberal visitation to allow him to counteract the negative brainwashing that the children are likely to continue to receive from" Heather and he should have at least six weeks of visitation in the summer.

Upon our de novo review of the record, we are not convinced increasing Nathan's visitation would be in the best interests of the children. In light of Nathan's busy work schedule and the fact that the children spent much of their time being cared for by people other than Nathan during his parenting time under the temporary matters order, we find the district court's visitation schedule promotes the goal espoused by section 598.41(1)(a). The schedule provides Nathan with liberal visitation and is not unreasonable.[2] Additionally, under the decree, the

---

[2] *Cf. In re Marriage of Gulsvig*, 498 N.W.2d 725, 726–72 (Iowa Ct. App. 1993) (ordering visitation schedule to include every other weekend, alternating holidays, and two to four weeks in the summer); *In re Marriage of Stepp*, 485 N.W.2d 846, 850 (Iowa Ct. App. 1992) (ordering visitation schedule including mid-week visitation; alternating weekends,

parties are free to agree to additional visitation beyond the minimum amount, and we are hopeful that the hostility between these parties will wane as soon as this matter is put to bed. We affirm the visitation schedule decreed by the district court.

**V.    Reopening of the Record**

Finally, Nathan argues the district court improperly declined to reopen the record to allow the presentation of newly discovered evidence from the children's new counselor. We review the district court's decision on whether to reopen the record for an abuse of discretion, our most deferential standard of review. *See State v. Long*, 814 N.W.2d 572, 575–76 (Iowa 2012); *Sun Valley Iowa Lake Ass'n v. Anderson*, 551 N.W.2d 621, 634 (Iowa 2006); *see also State v. Roby*, 897 N.W.2d 127, 137 (Iowa 2017).

Here, the matter was submitted in May 2017. Nathan filed motions to reopen the record in December 2017 and February 2018. In both motions, Nathan alleged the children's new counselor, who the children started seeing after trial, concluded Heather had coached the children and requested a DHS investigation relative to whether Heather was subjecting the children to mental and emotional abuse. The second motion included a letter from the counselor which noted Heather says negative things about Nathan and coached the children to make false statements about Nathan, and recommended that the children be placed in Nathan's care. The ensuing DHS investigation was "unfounded." In its decree,

---

birthdays, and holidays; and four weeks out of the summer); *In re Marriage of Drury*, 475 N.W.2d 668, 671 (Iowa Ct. App. 1991) (finding four weeks of summer visitation, in addition to regular visitation, to be sufficient to assure the child the opportunity for maximum continuing physical and emotional contact with both parents); *In re Marriage of Lacaeyse*, 461 N.W.2d 475, 477 (Iowa Ct. App. 1990) (ordering visitation schedule to include every other weekend and four hours of mid-week visitation).

the court noted it was troubled by the allegations, but stated finalizing the dissolution and implementing a permanent physical care arrangement would be in the best interests of the children. Upon our de novo review, we are unable to say the district court exercised its discretion on grounds or for reasons clearly untenable or to an extent clearly unreasonable. The record indicates that the pending status of these proceedings is what has been causing the acrimony between these parties, each trying to gain the upper hand over the other by manufacturing evidence against one another before the matter becomes final. In any event, the conduct alleged to have been engaged in by Heather in the motions to reopen was largely cumulative of the conduct she was alleged to have engaged in at the time of trial. There was already evidence in the record that Heather was potentially engaging in this kind of conduct and the court recognized and considered it along with the remaining evidence. Given the cumulative nature of the evidence, a denial of the motions to reopen was not improper. *See Godar v. Edwards*, 588 N.W.2d 701, 710 (Iowa 1999); *Moser v. Stallings*, 387 N.W.2d 599, 603 (Iowa 1986); *In re Marriage of Franzen*, No. 03-1031, 2004 WL 899518, at *2 (Iowa Ct. App. Apr. 28, 2004).

## VI.    Attorney Fees

Heather requests an award of appellate attorney fees. An award of appellate attorney fees is not a matter of right but rests within this court's discretion. *In re Marriage of Berning*, 745 N.W.2d 90, 94 (Iowa Ct. App. 2007). In determining whether to award attorney fees, we consider the needs of the party making the request, the ability of the other party to pay, and whether the party making the request was obligated to defend the district court's decision on appeal. *Id.* In

consideration of these factors, we decline to award attorney fees in this appeal.
Costs on appeal are assessed to Nathan.

## VII.    Conclusion

We affirm the decree dissolving the parties' marriage in its entirety.  Costs
on appeal are assessed to Nathan.

**AFFIRMED.**