# IN THE COURT OF APPEALS OF IOWA

No. 24-1575
Filed July 23, 2025

**AARON DANIEL SMART,**
        Petitioner-Appellee/Cross-Appellant,

**vs.**

**MICHELLE MARIE RALLS,**
        Respondent-Appellant/Cross-Appellee.
_____

Appeal from the Iowa District Court for Wapello County, Greg Milani, Judge.

Two parents separately appeal a custody decree under Iowa Code chapter 600B (2022). **AFFIRMED ON APPEAL AND CROSS-APPEAL.**

Bryan J. Goldsmith and Carly M. Schomaker of Gaumer, Emanuel & Goldsmith, P.C., Ottumwa, for appellant/cross-appellee.

Heather M. Simplot of Harrison, Moreland, Webber & Simplot, P.C., Ottumwa, for appellee/cross-appellant.

Considered without oral argument by Greer, P.J., and Langholz and Sandy, JJ.

**LANGHOLZ, Judge.**

Michelle Ralls and Aaron Smart share a now-ten-year-old son but were never married. After years of successfully co-parenting the son while their relationship fluctuated, Smart eventually petitioned for a custodial order under Iowa Code chapter 600B (2022). And he asked to change the son's last name from Ralls to Smart. The district court ordered joint physical care and preserved the son's last name as Ralls. Both parents now appeal—Ralls urges us to place the son in her physical care and Smart seeks again to change the son's last name.

On our de novo review—giving due deference to the district court's first-hand view of the evidence and witnesses—we agree that joint physical care is in the son's best interest. The parties have proven capable of co-parenting and do not exhibit the degree of strife that renders joint physical care unworkable or detrimental to the son. As for the son's last name, assuming the court had authority to consider this name-change request under chapter 600B even though Ralls did not unilaterally select the name, we agree with the court that the change is not in the son's best interest. The son has had this last name for ten years, he shares it with his half-sister, and preserving his identity promotes consistency, convenience, and stability for the son. We thus affirm the district court's order on both the appeal and cross-appeal. And we decline Smart's request for appellate attorney fees.

## I. Factual Background and Proceedings

Smart and Ralls began dating in 2010. Ralls had a daughter from a prior relationship, and Smart has cared for the daughter as his own since she was two years old. In March 2015, Smart and Ralls welcomed a son. When the son was born, the parties agreed that he son would have his mother's last name—Ralls—

and Smart would pick his first and middle name. At the time, his son having the last name Ralls "didn't bother" Smart and it allowed the son to share a last name with his half-sister. Smart also anticipated marrying Ralls and believed she would change both children's last names to Smart upon getting married.

But the wedding never happened—Smart and Ralls initially ended their relationship around 2016. The couple then was on-again-off-again for a few years. Throughout this time, they successfully co-parented both children. In 2019, the couple agreed to alternate weeks caring for their son after breaking up again. They briefly reunited sometime later, but the relationship ended for good in fall 2021. The parties then continued with the weekly care arrangement without issue.

In August 2022, Smart petitioned under chapter 600B to establish custody and change the son's last name. About a year later, while the case was pending, the court entered a temporary-matters order placing the son in Ralls's physical care and granting Smart liberal visitation. During a two-day trial, Smart requested joint physical care while Ralls argued in favor of preserving the temporary-matters arrangement.

The court ultimately sided with Smart and ordered joint physical care. The court reasoned that Smart and Ralls offered starkly different accounts of their co-parenting abilities, and the court found Smart more credible. It also found the parties were able to share physical care of their son for years and much of their current animosity was driven by this litigation. Indeed, the court anticipated the parties would "return to their civil behaviors" after the proceedings ended. And so, it found joint physical care was both feasible and in the son's best interest. As for the son's last name, the district court held that Smart failed to show changing the

son's last name was in his best interest and that it did not have authority under chapter 674 to alter the son's birth certificate.

Both Ralls and Smart appeal.

## II.    Joint Physical Care

Ralls appeals the joint-physical-care award, arguing that the son is best served in her physical care with Smart having liberal visitation.  We review a physical-care ruling within a custody and support decree under chapter 600B de novo.  *McKee v. Dicus*, 785 N.W.2d 733, 736 (Iowa Ct. App. 2010).  To guide our analysis, we look to the factors in Iowa Code section 598.41(3) and those discussed in *In re Marriage of Winter*, 223 N.W.2d 165, 166–67 (Iowa 1974).  And where, as here, a child has two suitable parents, our physical-care analysis places special weight on (1) the "stability and continuity of caregiving"; (2) the ability of the parents to "communicate and show mutual respect"; (3) "the degree of conflict between [the] parents"; and (4) "the degree to which the parents are in general agreement about their approach to daily matters."  *In re Marriage of Hansen*, 733 N.W.2d 683, 696–99 (Iowa 2007).

Like the district court, we find joint physical care is both workable and in the son's best interest.  The record is replete with instances of Ralls and Smart communicating well and jointly participating in their son's life without discord.  During the years of alternating weeks with the son, there were no problems arranging drop-offs and pick-ups.  Ralls and Smart attend all his parent-teacher conferences together—for the most recent conference, they agreed to an arrival time, parked next to each other, walked in together, and participated together.  Both the son and his half-sister are active in sports and extracurricular activities,

resulting in Smart and Ralls frequently interacting every week. Even while this action was pending, Smart and Ralls capably coordinated travel and hotels—sometimes driving together and staying in the same hotel room with both children—for the son's baseball games. They have celebrated holidays and the children's birthdays together. And Smart and Ralls are generally aligned when it comes to both fundamental and day-to-day decisions about the son.

Ralls paints a different picture, highlighting instances of alleged misconduct and disrespectful communication that she believes undermine the viability of joint physical care. But the district court found that Ralls largely exaggerated the degree of strife and downplayed their years of successful co-parenting. And significantly, it found her testimony uncredible for the most serious accusations. "Left as we are to reading black words on a white page of a sterile transcript, this is precisely the kind of credibility determination best entrusted to the district court judge," whose "front-row seat to the live testimony" places it in a far better position to weigh each party's testimony. *In re Marriage of Wang & Ye*, ___ N.W.3d ___, ___, 2025 WL 704285, at *4 (Iowa Ct. App. 2025) (cleaned up). We see no basis in our record to depart from the district court's informed findings that the parties are able to communicate, show respect, and put aside their differences for their son.

Ralls also argues that the burden of arranging the son's education, appointments, and schedule falls on her, as Smart takes little initiative unless it relates to sports. On this point, Smart concedes that Ralls "is a lot better" at ensuring the children regularly see their medical providers and attend their appointments. But the district court did not find Smart's participation so wanting as to justify departing from joint physical care, and it viewed their contrasting

parenting styles "as more of a benefit to [the son] than a detriment." And while we encourage Smart to ensure he carries his equal share of the logistical load going forward, we agree with the district court that this fact doesn't tip the scale away from joint physical care under the totality of the circumstances. *See Randall v. Trier*, 15 N.W.3d 809, 815 (Iowa Ct. App. 2024) (affirming joint physical care when both parents were "capable caregivers," despite the mother generally being "the keeper of routine").

At bottom, Smart and Ralls have proven capable of successfully co-parenting and do not exhibit the degree of conflict that would render joint physical care unworkable. *See Hansen*, 733 N.W.2d at 696–99; *see also Hensch v. Mysak*, 902 N.W.2d 822, 826–27 (Iowa Ct. App. 2017) (affirming joint physical care when "communication difficulties and tension" did not "rise above the not atypical acrimony that accompanies litigation in family-law matters" and the court expected the parents' difficulties to ease "as the parties become further removed from the intense heat of the litigation and trial process"). Because both are good parents who love their son, joint physical care maximizes the son's time with each parent. Thus, we affirm the joint-physical-care award.

### III. The Son's Last Name

In his cross-appeal, Smart argues the district court should have changed the son's last name from Ralls to Smart, or alternatively, hyphenated the two surnames. On appeal—as in the district court—both parties focus their debate on whether the name change is in the son's best interest. Neither party addresses the threshold question of whether this is an initial name determination over which the court has authority under chapter 600B—even though Ralls did not unilaterally

select the name at birth—or a name change that could only be properly brought under chapter 674. *Compare Montgomery v. Wells*, 708 N.W.2d 704, 706–07 (Iowa Ct. App. 2005), *with Braunschweig v. Fahrenkrog*, 773 N.W.2d 888, 890–93 (Iowa 2009); *see also Peckosh v. Wenger*, No. 11-0119, 2011 WL 4578532, at *4–5 (Iowa Ct. App. Oct. 5, 2011) (holding in a split decision that when a child's original name was not a unilateral decision of one parent, the name may only be changed under chapter 674). But since this is a question of authority—not subject matter jurisdiction—and Ralls has not raised the issue, we assume that the court had authority and consider the merits of the name-determination analysis. *See Montgomery*, 708 N.W.2d at 706–07, 706 n.1.

We have we identified several nonexclusive factors that guide our name-determination analysis, including convenience for the child, identifying the child within a family unit, avoiding confusion for the child, the length of time the child has used his current last name, any parental misconduct or absence, community respect associated with a last name, potential positive or negative effects on the child's bond with a parent, any delays to objecting to the name change, the child's preference, and the motivation of the parent seeking the name change. *See id.* at 708–09. Ultimately, our polestar is the son's best interest. *Id.* at 708.

Despite the child-centered nature of our inquiry, Smart's arguments in favor of changing the son's last name turn solely on his own desires. Indeed, Smart argues that (1) the son is his only biological child, so he wants his son "to carry [his] last name"; (2) he owns businesses that use the "Smart" name, which he hopes to pass on to the son; and (3) he believes it is "embarrassing" for the son not to have his father's last name.

Smart's first two points carry little weight—Smart's preference for his own name does not impact the son's wellbeing and the son's last name poses no barrier to inheriting the family business. And his third point is unsupported by the record—the only evidence relating to the son's feelings were Smart's own speculation and Smart's mother's belief that other children have at times asked the son questions about his last name. Smart has shown no evidence suggesting the son has a preference or that the son has been disadvantaged by having his mother's last name. *See In re Marriage of Gulsvig*, 498 N.W.2d 725, 729 (Iowa 1993) (rejecting the "presumption that a child bear the surname of his father" as "outdated").

Turning to the other *Montgomery* factors, the son's last name has been Ralls for ten years. *See Rosenow v. Link*, No. 24-0140, 2024 WL 4502232, at *4 (Iowa Ct. App. Oct. 16, 2024) (approving a name change when the child was "too young to be attached to a surname or have peers who identify him by his current surname," and thus would not suffer any "emotional harm" from the change in identity). He shares that last name with his half-sister, which promotes their bond and provides consistency for both children. And Smart waited years to object to the son's last name—only raising the issue after the son began playing sports and Smart grew bothered hearing announcers refer to his son with the last name Ralls. *See Kollbaum v. Blevins*, No. 18-1015, 2019 WL 1056037, at *2 (Iowa Ct. App. Mar. 6, 2019) (preserving child's surname after father delayed challenging the child's initial name determination for over two years). We thus agree with the district court that the name change is not in the son's best interest and affirm its denial of this request.

### IV.     Attorney Fees

Finally, Smart requests appellate attorney fees.   We have discretion whether to award appellate attorney fees in an appeal of a dissolution decree.  *See In re Marriage of Samuels da Fonseca Silva*, 15 N.W.3d 801, 808 (Iowa Ct. App. 2024).   In exercising that discretion, "we consider the needs of the party seeking the award, the ability of the other party to pay, and the relative merits of the appeal." *Id.* (cleaned up).   Considering these factors, including Ralls's success defending Smart's cross-appeal and the parties' respective abilities to pay, we exercise our discretion to deny Smart's request for appellate attorney fees.   Appellate court costs shall be assessed equally to the parties.

**AFFIRMED ON APPEAL AND CROSS-APPEAL.**