# IN THE COURT OF APPEALS OF IOWA

————————————

No. 25-0261
Filed January 7, 2026

————————————

**In re the Marriage of Kelsey R. Meester and Tyrus D. Meester**

Upon the Petition of
**Kelsey R. Meester n/k/a Kelsey R. Webb,**
Petitioner–Appellee,

And Concerning
**Tyrus D. Meester,**
Respondent–Appellant.

————————————

Appeal from the Iowa District Court for Black Hawk County,
The Honorable Joel A. Dalrymple, Judge.

————————————

**AFFIRMED**

————————————

Andrew B. Howie of Shindler, Anderson, Goplerud & Weese, P.C., West
Des Moines, attorney for appellant.

John J. Wood of Beecher, Field, Walker, Morris, Hoffman & Johnson, P.C.,
Waterloo, attorney for appellee.

————————————

Considered without oral argument
by Schumacher, P.J., and Badding and Langholz, JJ.
Opinion by Badding, J.

1

**BADDING, Judge.**

By the time he was thirty-six years old, Tyrus Meester had three convictions for operating while intoxicated and one for public intoxication. Yet at the trial to dissolve his marriage to Kelsey Meester, he denied having a drinking problem. The district court was not convinced and placed the parties' young child in Kelsey's physical care. Tyrus appeals, claiming that the child should have instead been placed in their joint physical care. In the alternative, Tyrus asks for more visitation with the child. Finally, Tyrus claims the court's property division was inequitable because he was not given a credit for the premarital student loans that Kelsey paid off during the marriage. We reject these claims upon our de novo review of the record and affirm the dissolution decree.

## I.   Background Facts and Proceedings

Tyrus and Kelsey met in 2017 and married in August 2020. Their son was born two years later. The couple separated in January 2024, mostly because of Kelsey's concerns about Tyrus's alcohol use. She petitioned for divorce that month and later agreed to a temporary order that placed the child in their joint physical care. The order was conditioned on Tyrus using an alcohol detection device when the child was in his care. Unhappy with the schedule—and concerned about Tyrus's continued drinking and poor communication—Kelsey sought physical care of their son at the dissolution trial in October 2024.

Kelsey was thirty-four years old at trial and employed as a nurse practitioner. She completed her degrees in December 2018 and paid over $120,000 on her student loans during the marriage, satisfying them in August 2023. The couple kept their finances separate during the marriage, and all the payments that Kelsey made on the loans came from her bank

account. Kelsey testified that she has a flexible schedule as a nurse practitioner, usually working three to five days a week from 11:00 a.m. until 3:00 p.m., plus some time at home completing patients' charts. She also has a telehealth business focused on weight loss and men's hormone replacement therapy. Kelsey earns a gross annual income of about $168,000 from both jobs.

Tyrus, who was thirty-six years old at trial, is employed as a maintenance supervisor at John Deere. He works first shift from 6:00 a.m. until 2:30 p.m. But because he is a supervisor, Tyrus usually goes in early and stays late. Kelsey testified that he often left for work at 3:00 or 4:00 a.m. and stayed until 4:00 p.m. Tyrus earns about $150,000 gross per year from his employment.

Kelsey's concerns with Tyrus's alcohol use started before their child was born. She testified:

> Throughout our relationship and marriage, Tyrus has drank excessively to the point of sometimes blacking out, getting angry, driving when he shouldn't be driving, being with friends who are driving when they shouldn't be driving, not coming home at night after drinking, getting very angry and explosive towards me, towards my friends, towards his friends. Just generally drinking in excess.

Tyrus had two convictions for operating while intoxicated before the marriage—one in 2009 and another in 2015. He was also convicted of public intoxication in 2020, after the parties were married. Kelsey hoped that when their son was born, Tyrus would change his drinking habits. But they stayed the same. Kelsey testified there were "quite a few instances" that "Tyrus didn't come home because he was out drinking with friends or family. If he did come home, he was sleeping in pretty consistently until ten-, eleven-,

twelve-o'clock, that was a regular occasion, or so drunk that he couldn't parent if needed if he was home."

The tipping point for Kelsey came in October 2023, when Tyrus was arrested for his third operating while intoxicated offense. Kelsey testified that she was getting their son ready for bed at about 7:00 p.m. when Tyrus came home "very clearly . . . drunk after drinking all day" at a golf tournament. He sat down on the couch and accidentally landed on their son's legs, which caused the couple's dogs to start "jumping all over him." Kelsey testified that Tyrus picked the dogs up by their necks and threw them outside. As she got off the couch, Kelsey said that Tyrus came back towards them "yelling, screaming, swearing, profanity, calling [her] names." Scared, Kelsey tried to leave the house with their son, but Tyrus wouldn't let her put him in the car seat. So she started walking to a neighbor's house. Tyrus briefly chased after them before going back to the house, getting into his vehicle, and driving off. About thirty minutes later, the police called Kelsey to let her know Tyrus had been in a rollover accident.

Tyrus started outpatient substance-use treatment soon after his arrest,[1] and the couple decided to go on a previously planned vacation in December. Even though he was in treatment, Kelsey testified that Tyrus was so drunk on at least three nights of their vacation, that he was "throwing up all over the room." Tyrus downplayed Kelsey's account of their vacation, testifying that it "[c]ould have been a lot of things that made me throw up," although he later acknowledged it "probably was" the alcohol. At a couples' counseling session the next month, Tyrus told Kelsey that he was not going to stop drinking. So she moved forward with the divorce.

---

[1] He later pled guilty to the operating while intoxicated charge.

Although Tyrus agreed to use an alcohol detection device as part of the temporary custody agreement, he had a series of late or missed tests and one positive test before the dissolution trial. Some of the missed tests were from a vacation Tyrus took in May 2024 with the child. He hired a babysitter to watch the child while he went out drinking but refused Kelsey's requests to use the device the next day. Tyrus did the same thing in July when he went to a concert, although that time he tested the next day and was still positive for alcohol around 1:00 p.m. When asked about this positive test at trial, Tyrus blamed it on the "yeast in the pizza" he had for lunch. Tyrus maintained that he did not have a drinking problem because he only drinks "about every two months if that" and never on weeknights or in his child's presence.

After hearing this evidence, the district court denied Tyrus's request for joint physical care of the child. On the issue of Tyrus's drinking, the court found:

> When asked, Tyrus denies that he has any intentions or plans of ever drinking while [the child] is in his care "absent having a caretaker." The Court takes issue with Tyrus's response for two reasons. Number one, despite being arrested three times for operating while intoxicated and once for public intoxication, Tyrus fails to recognize that he has a drinking problem and that he abuses alcohol. Tyrus fully intends to drink during scheduled parental time but intends to utilize an alternate caregiver while doing so. Secondly, the Court is certain Tyrus had no intention of ever drinking and driving again following his first arrest. . . . [T]he Court believes[] he had expressed such intentions following his second [operating while intoxicated] arrest. Now, having been *caught* and convicted a third time, the Court places little value on Tyrus's expressed intentions. Time will only tell.

The court was also somewhat concerned with the parties' communication—noting disputes about the child's pediatrician, the daycare drop-off time

5

when the child was in Tyrus's care, and demeaning text messages from Tyrus.

Given those concerns, and Kelsey's role as the child's primary caregiver during the marriage, the district court found that placing the child in Kelsey's physical care was in his best interests. The court ordered "reasonable and liberal visitation" for Tyrus, to include alternating weekends and every Wednesday evening. With respect to the division of the parties' property, the court denied Tyrus's request to assign Kelsey's student loan payments to her as an asset and ordered Tyrus to pay Kelsey an equalization payment of $9,733.50. Tyrus appeals these physical care, visitation, and economic provisions of the court's dissolution decree.

## II.    Standard of Review

Equitable proceedings, such as dissolutions of marriage, are reviewed de novo. *See* Iowa R. App. P. 6.907; *In re Marriage of Miller*, 966 N.W.2d 630, 635 (Iowa 2021). While we are "not bound by the district court's findings, we give them weight and defer especially where the credibility of witnesses is a factor in the outcome." *Hora v. Hora*, 5 N.W.3d 635, 645 (Iowa 2024) (cleaned up). This deference is especially important in dissolutions, "where the court's front-row seat to the parties' testimonies 'greatly help[s]' the court 'in making a wise decision about the parties' and their children." *In re Marriage of Mines*, No. 24-1135, 2025 WL 855507, at *2 (Iowa Ct. App. Mar. 19, 2025) (quoting *In re Marriage of Vrban*, 359 N.W.2d 420, 423 (Iowa 1984)).

## III. Analysis

### A. Physical Care

We begin with Tyrus's claim that the district court should have placed the parties' child in their joint physical care. Where, as here, "joint legal custody is awarded to both parents, the court may award joint physical care to both joint custodial parents upon the request of either parent." Iowa Code § 598.41(5)(a) (2024). The goal is to place the child in an environment that promotes the child's physical health, mental health, and social maturity. *In re Marriage of Hansen*, 733 N.W.2d 683, 695–96 (Iowa 2007).

Courts generally consider the factors in Iowa Code section 598.41(3) and *In re Marriage of Winter*, 223 N.W.2d 165, 166–67 (Iowa 1974), when deciding physical care. *See Hansen*, 733 N.W.2d at 696. The following nonexclusive factors are also considered in determining whether joint physical care is in a child's best interest:

> (1) "approximation"—what has been the historical care giving arrangement for the child between the two parties; (2) the ability of the spouses to communicate and show mutual respect; (3) the degree of conflict between the parents; and (4) "the degree to which the parents are in general agreement about their approach to daily matters."

*In re Marriage of Berning*, 745 N.W.2d 90, 92 (Iowa Ct. App. 2007) (quoting *Hansen*, 733 N.W.2d at 697–99). "Any consideration of joint physical care, however, must still be based on Iowa's traditional and statutorily required child custody standard—the best interest of the child." *Hansen*, 733 N.W.2d at 695.

Tyrus argues the *Hansen* factors show that joint physical care was in the child's best interest. He points to the parties' successful caregiving while the divorce was pending, their ability to communicate and low conflict

relationship, and his proven "ability to curtail his alcohol consumption." In sum, Tyrus contends that Kelsey's "continued concerns of how they would fare as joint physical custodians were minor and insufficient." We disagree.

A parent's history of substance use can outweigh other considerations in determining whether joint physical care is in a child's best interest. *See Hansen*, 733 N.W.2d at 697; *see also In re Marriage of Hurm*, No. 24-0279, 2024 WL 4618989, at *3 (Iowa Ct. App. Oct. 30, 2024) (concluding joint physical care was not in the children's best interest because of the mother's history of substance use); *Kaspar v. Biermann*, No. 21-0123, 2022 WL 1100244, at *4 (Iowa Ct. App. Apr. 13, 2022) (finding a mother's substance use and poor decision-making supported placing the child in the father's physical care). While the district court thoroughly discussed those other considerations, including the ones highlighted by Tyrus on appeal, it was mostly concerned with Tyrus's drinking—as are we.

The court found that although Tyrus "does not drink daily," when he "does drink, he often, if not always, drinks to excess. Virtually all witnesses presented on the issue support the Court's determination that Tyrus abuses alcohol." Tyrus refused to admit that he had a drinking problem—despite his alcohol-related convictions, one of which involved a rollover accident. *See In re Marriage of Harris*, 499 N.W.2d 329, 332 (Iowa Ct. App. 1993) (placing the children in their father's physical care where their mother continued to drink and deny her problems with alcohol after multiple criminal convictions). When asked about that accident, Tyrus minimized it, testifying that he "had a few beers that day" and "was reaching for [his] phone" when he rolled the car. But according to the criminal complaint admitted as an exhibit at trial, Tyrus blew a .186 on the DataMaster breathalyzer test more than one hour after the accident was reported.

Although Tyrus completed six months of substance use treatment, he continued to drink excessively during treatment—to the point of vomiting and passing out while on vacation with Kelsey in December 2024. The court was also concerned that during the temporary-order period, Tyrus was

> deferring the child's care to others to socialize and drink and instances where he intends to drink to a point where it would interfere with his ability to parent the following day. On the one hand, Tyrus recognizes the need and actively plans to address the child's care; however, the Court finds it concerning that Tyrus unabashedly concedes he makes such plans with the intent that he will ultimately overindulge and/or abuse alcohol.

We share the same concerns on our de novo review of the record, particularly considering Tyrus's angry and belligerent behavior when he's intoxicated.

The approximation principle also weighs in Kelsey's favor. *See Hansen*, 733 N.W.2d at 697–98 ("[W]here one spouse has been the primary caregiver, the likelihood that joint physical care may be disruptive on the emotional development of the children increases."). The district court found that Kelsey was the primary caretaker during the marriage. Tyrus does not dispute that finding. But he argues "the pattern of caregiving weighs less in Kelsey's favor because both parents work full-time jobs, which required [the child] to attend daycare." Although a child's attendance at daycare can lessen the weight assigned to approximation, "we do not make a mere quantitative calculation of hours spent together; instead, we look at the unique circumstances and intricacies of each family." *Randall v. Trier*, 15 N.W.3d 809, 813 (Iowa Ct. App. 2024) (citing *Hansen*, 733 N.W.2d at 697). In this family, although Tyrus was not an idle parent, Kelsey handled most of the routine tasks for their child: she got him ready in the mornings, dropped him off at daycare, scheduled and attended his medical appointments, stayed home with him when he was sick, and handled feedings and diaper changes.

We recognize that once the parties separated, Tyrus took on a more active role. *See* Iowa Code § 598.41(3)(d) (requiring the court to examine "[w]hether both parents have actively cared for the child before and since the separation"). However, the important factors of stability and continuity of caregiving underlying the approximation principle "focus on the caretaking arrangement *prior to* the parties' separation." *In re Marriage of Arnold*, No. 08-1103, 2009 WL 779041, at *3 (Iowa Ct. App. Mar. 26, 2009) (emphasis added); *see also Hansen*, 733 N.W.2d at 696 (noting stability and continuity of caregiving "tend to favor a spouse who, prior to divorce, was primarily responsible for physical care"); *In re Marriage of Banister*, No. 22-0221, 2022 WL 16985237, at *5 (Iowa Ct. App. Nov. 17, 2022) (finding approximation weighed in the mother's favor where the father's caretaking only increased after the parties' separation). And in any event, stability and continuity are traditionally more important "where there are two suitable parents." *Hansen*, 733 N.W.2d at 696. As discussed above, Tyrus's alcohol use affects his suitability as a parent. *See id.* at 697; *see also* Iowa Code § 598.41(3)(a) (considering each parent's suitability).

Although the remaining factors do not heavily weigh on one side or the other, they tilt in Kelsey's favor—especially in the shadow of Tyrus's alcohol use. While the district court was troubled by some of Tyrus's post-separation text messages to Kelsey, it found that "for the most part the parties communicate appropriately regarding the child's needs." The inappropriate messages—the name-calling, argumentative, and belittling ones—all came from Tyrus. *See Banister*, 2022 WL 16985237, at *6 (finding that although "these are not the most severe instances of conflict we have seen in custody cases, they are enough to tip the scales toward physical care" with the mother, when combined with her role as primary caretaker during the marriage). Kelsey testified that Tyrus has a "high conflict personality"

10

and that he could be "hostile and vindictive." Tyrus agreed that he was more confrontational than Kelsey but maintained that when their child "is our conversation there are no arguments." The messages between the parties show otherwise, with Tyrus arguing about the child's drop-off time at daycare and his pediatrician, among other issues.

Balancing the relevant factors, and giving deference to the district court's position to assess the parties and judge their credibility, we find that placing the child in Kelsey's physical care is in his best interest. This does not diminish Tyrus's important role in the child's life, which Kelsey has a duty to maintain. *See Hansen*, 733 N.W.2d at 695 ("[T]he quality, and not the quantity, of contacts with the non-custodial parent are the key to the wellbeing of children.").

## B. Visitation

On the issue of visitation, Tyrus asks us to modify the schedule if we affirm the district court's physical care decision. He contends that "maximum contact" is in the child's best interest, "and only two overnights out of every fourteen" is not enough. We agree that "liberal visitation rights," which will provide the child with "the opportunity for the maximum continuing physical and emotional contact with both parents," should be ordered "insofar as is reasonable and in the best interest of the child." Iowa Code § 598.41(1)(a). But we find the court's visitation schedule achieves that goal.

Even though our review is de novo, the district court "has a certain range of discretion within which to fashion a visitation order, as long as the order provides for visitation that is equitable and reasonable under the particular facts and circumstances." *In re Marriage of Godbolt*, No. 22-1550,

11

2023 WL 4759454, at *8 (Iowa Ct. App. July 26, 2023). The decree provides Tyrus with visitation on alternating weekends from Friday at 5:00 p.m. or after school and extracurricular activities until Sunday at 6:00 p.m., every Wednesday until 7:30 p.m., alternating school breaks and holidays, and four weeks each summer. Tyrus seeks more overnights with the child. But as Kelsey points out, his early morning work schedule is not conducive to extended weekend visitation or midweek overnights.

While we understand Tyrus's desire for more time with the child, "[q]uality interaction with children can, of course, occur within the framework of traditional visitation" like this. *Hansen*, 733 N.W.2d at 695; *see also In re Marriage of Gulsvig*, 498 N.W.2d 725, 726 (Iowa 1993) (finding a similar visitation schedule to be in a child's best interest); *In re Marriage of Stepp*, 485 N.W.2d 846, 850 (Iowa Ct. App. 1992) (same). We affirm the court's visitation schedule, noting the parties are free to agree to additional time.[2]

### C.    Property Division

With the physical care and visitation issues resolved, we turn to Tyrus's complaint about the district court's property division. He argues that the district court "erred by failing to assign $123,633.94 as an asset to Kelsey for her premarital college debt that was paid off during the marriage with marital funds." At trial, Tyrus actually sought a credit of $140,000 based on a Facebook post from Kelsey in August 2023 celebrating the payment of her student loans: "Four college degrees and ten years of school

---

[2] Kelsey testified that she would be comfortable with Tyrus having the child "a couple of days after work until close to bedtime."

turned into $140,000+ of student loans. They are FINALLY paid off." In denying this request, the court reasoned:

> While the debt itself may have approximated $140,000, Kelsey made payments towards the loans pre-marriage. Further, in 2021 Kelsey earned approximately $210,000. Meanwhile, Tyrus earned approximately $104,000. In 2022, Kelsey's reported income was approximately $208,000. Tyrus's approximated $129,000. . . . In that two-year span, when Kelsey's income alone exceeded Tyrus's by approximately $100,000 annually and doubled his income, she paid towards her student loans approximately $106,563. [3] Tyrus conceded on examination that none of those student loan payments ever came from the joint account of the parties.
>
> The Court declines to provide any latitude when considering allocation of assets, debts, and equalization payments resulting from Kelsey's student loans.

Tyrus relies on this court's decision in *In re Marriage of Campbell*, No. 13-1383, 2014 WL 1999231 (Iowa Ct. App. May 14, 2014), in arguing that the court's ruling was inequitable. In *Campbell*, we found that the district court should have given the wife a credit for half the principal reduction of the husband's premarital student loans. 2014 WL 1999231, at *5. We considered "the amount of principal reduction obtained with marital funds an asset to be divided," noting the debt was a nonmarital obligation incurred before the short-term marriage and joint funds were used to make periodic payments on the debt. *Id.* This court reached a different conclusion in *In re Marriage of Venteicher*, No. 14-0525, 2015 WL 1817026 (Iowa Ct. App. Apr. 22, 2015), which the district court cited to support its decision. We denied the requested credit in *Venteicher*, reasoning that because the spouse

---

[3] The district court didn't account for the payments that Kelsey made in 2023, which brought the total paid during the marriage to $123,633.94—the amount Tyrus seeks a credit for on appeal.

who owed the student loans "generated the vast majority of the couple's earnings, the debt was essentially paid down with her funds." 2015 WL 1817026, at *2.

As these two cases demonstrate, "[e]quitable distributions require flexibility and concrete rules of distribution may frustrate the court's goal of obtaining equitable results." *In re Marriage of Driscoll*, 563 N.W.2d 640, 642 (Iowa Ct. App. 1997). "Because precedent is of little value when framing a distribution, our decision must ultimately depend on the particular facts relevant to each case." *In re Marriage of McDermott*, 827 N.W.2d 671, 682 (Iowa 2013). We give the district court "considerable latitude in resolving disputed claims and will disturb a ruling 'only when there has been a failure to do equity.'" *In re Marriage of Smith*, 573 N.W.2d 924, 926 (Iowa 1998) (citation omitted). We find no inequity here.

Tyrus's request for a credit rests on the premarital nature of Kelsey's student loan debt. But that is just one factor for the court to consider in making an equitable distribution of property. *See* Iowa Code § 598.21(5)(b); *see also In re Marriage of Sullins*, 715 N.W.2d 242, 247 (Iowa 2006). Automatically setting aside premarital assets or debts is "contrary to our distribution scheme." *Sullins*, 715 N.W.2d at 247; *see also In re Marriage of Spitzmiller*, No. 17-0803, 2018 WL 4922982, at *3 (Iowa Ct. App. Oct. 10, 2018). And when crafting an equitable division, "the court can only award assets and debts that then exist, and it must generally do so based on their value at the time of trial." *In re Marriage of Rasmussen*, No. 23-0805, 2024 WL 3688309, at *3 (Iowa Ct. App. Aug. 7, 2024); *see also In re Marriage of Foster*, No. 23-1558, 2025 WL 719056, at *2 (Iowa Ct. App. Mar. 5, 2025) (modifying a dissolution decree to remove a non-existent debt assigned to one

14

spouse). The credit that Tyrus seeks does not align with these equitable distribution principles.

Beyond those principles, we note that unlike the spouse in *Campbell*, Tyrus is not asking for a proportional credit. Instead, he wants a credit for the entire amount Kelsey paid during the marriage, at a time when her income was more than double what Tyrus was earning. *See Venteicher*, 2015 WL 1817026, at *2. That would result in a lopsided division and a windfall for Tyrus. Under these facts, we conclude the district court's denial of Tyrus's requested credit did not fail to achieve equity between the parties. *See Smith*, 573 N.W.2d at 926.

## IV. Conclusion

On our de novo review of the record, with appropriate deference to the district court's fact findings and credibility assessments, we affirm the court's decision to place the parties' child in Kelsey's physical care and the visitation schedule for Tyrus. We also affirm the court's refusal to give Tyrus a credit for Kelsey's student loan payments and resulting property division.

**AFFIRMED.**